528 P.2d 160

**RAYBOND ELECTRONICS, INC., a corpo-
ration, and Willcox & Gibbs, a corpora-
tion, Appellants and Cross-Appellees,**

v.

**GLEN–MAR DOOR MANUFACTURING
COMPANY, a corporation, Appel-
lee and Cross-Appellant.**

**No. I CA–CIV 2147.**

Court of Appeals of Arizona,
Division 1,
Department C.

Nov. 19, 1974.

Rehearing Denied Dec. 18, 1974.

Review Denied Jan. 21, 1975.

Leibsohn, Eaton, Gooding & Romley, P.
C., by William H. Gooding, Phoenix, for
appellants and cross-appellees.

Snell & Wilmer, by Warren E. Platt, Phoenix, for appellee and cross-appellant.

## OPINION

NELSON, Judge.

This is an action initiated by Glen-Mar Door Manufacturing Company (Glen-Mar) against Raybond Electronics, Inc. (Raybond) and Willcox & Gibbs, Raybond's parent corporation, for breach of contract and negligence in the manufacture and installation of an electronic, high-frequency system for curing glue in the production of Glen-Mar's hollow-core wooden doors. The contract in question contained a provision limiting Raydon's liability for any consequential damages caused by the failure of their equipment to produce in accordance with the contract. Pursuant to A.R.S. § 44–2319, after hearing all the evidence, the trial court ruled, as a matter of law, that this clause in the contract was unconscionable and therefore unenforceable. At this time the trial court also granted a directed verdict in favor of the parent corporation, Willcox & Gibbs. The cause was then submitted to the jury which awarded Glen-Mar damages against Raybond in the amount of $100,000. This appeal followed.

Since we find that the trial court erred in holding that the clause limiting consequential damages was unconscionable, it will be necessary to recount the facts surrounding the negotiations of this transaction in some detail. While there are other questions · presented for review, we will only discuss those likely to recur during subsequent proceedings in this cause, or necessary to fully review the primary question of unconscionability.

### I.

Glen-Mar is an Arizona corporation engaged in the manufacture and sale of hollow-core wooden doors. The basic process of manufacture involves the gluing of two pieces of laminated wood onto a frame. Hot and cold presses were used to apply pressure to the outer surfaces and the door frames, while the glue which held them together was curing to form a strong bond.

Beginning in 1967 or 1968, Glen-Mar began to investigate the possibilities of increasing their production by the use of a different type of equipment. At that time, they were producing approximately 2,000 doors per day, had gross sales of about $3,000,000, and could sell virtually all the doors they were capable of producing.

In May of 1969, Raybond and Glen-Mar began their discussions which led to the contract in question. Preliminary negotiations were between Joe Erz (Erz), Sales Manager for Raybond, and Marty Wist (Wist), General Manager for Glen-Mar. Wist explained to Erz that Glen-Mar was desirous of increasing their production level, that they had looked at several different systems, and that it appeared that one possibility for such an increase in production would be a high-temperature system of some sort that would shorten the glue-curing time for each door. Erz indicated that an electronic heating system to accomplish such a result was a definite possibility, and that Raybond, as a leading producer of high-frequency gluing equipment, was certainly interested in exploring the matter further.

A series of telephone conversations and one letter from Glen-Mar of June 3, 1969, resulted in Raybond submitting a letter on June 19, 1969, proposing a continuous-flow machine wherein the doors would be moving throughout the process of gluing and curing. This letter was written to Wist by Bruce K. Heick (Heick), Raybond's Development Engineer, and indicated that this process was a new one not in operation anywhere. Wist responded by letter of June 26, 1969, stating that Glen-Mar had already talked to glue suppliers about a continuous-flow machine and were concerned about the strength of the bond in such a process. Wist renewed his request for answers to questions put to Raybond in the earlier letter of June 3, 1969, regarding prices and description of components for a stationary press system incorporating

high-frequency glue curing in the production of flush doors. The June 26, 1969, letter contains the first written confirmation of Glen-Mar's desire to construct its own press and handling system, incorporating Raybond's electronic components.

As a result of Wist's letter on June 26, 1969, additional telephone conversations took place as well as a letter from Erz to Mr. Russell Burge (Burge) on September 2, 1969, enclosing photographs and drawings in an effort to supply Glen-Mar with all the information they requested. Glen-Mar had already contacted Burge, a consultant and expert in designing automated handling systems, regarding the system for feeding the doors into the press and the press itself. On September 22, 1969, a meeting took place at the Skyriders' Hotel in Phoenix, Arizona. The meeting was attended by Wist, Erz, Burge, and Bob Clifford (Clifford), Plant Superintendent of Glen-Mar. In the two-hour meeting extensive discussions were held regarding the concepts of the whole system, including the review of preliminary drawings; size, shape, number of generators; construction and design of the handling system; time cycle for each door through the system (four to six per minute was the consideration at this point); and many other technical matters. Everyone left the meeting very optimistic about the feasibility of the system they had discussed.

After the September meeting, Wist, Erz, and Burge had many additional telephone conversations, further refining what had been accomplished in their face-to-face meeting. On October 3, 1969, Erz sent to Burge, with a copy to Wist, Raybond's initial written offer to Glen-Mar. The offer consisted of a Quotation Form describing two Raybond generators, their prices, delivery terms, terms of payment, terms of guarantee which included the clause limiting liability and consequential damages and a standard arbitration clause, and a two-page letter describing in detail the component parts of the generator as well as the manner of installation and wiring. The letter also outlined Raybond's responsibilities regarding the initial phase of operation of the equipment and the education of Glen-Mar's personnel in its operation. This quotation and letter contained the following clause limiting consequential damage which the lower court held unconscionable:

### "L I A B I L I T Y"

"The Seller's liability arising out of the supplying of equipment or its use, whether on warranties or otherwise, shall not in any case exceed the cost of correcting defects in the equipment. All such liability shall terminate upon the expiration of the guarantee period. The seller shall not be liable for any loss, damage or expense directly or indirectly arising from the use of the material or from any other cause, *and in no case will the Seller be liable for any consequential damage.* Any legal action against the Seller must be commenced within one year from the date of shipment." (Emphasis within paragraph supplied.) (Exhibit 7)

Upon receipt of the offer, it was evaluated by Wist, Burge, Clifford, and Aram Mardian (Mardian), Chairman of the Board of Glen-Mar. Their primary concern, Mardian's in particular, was that they obtain an absolute guarantee of the ten-second cycle. If the system could not produce a door at least every ten seconds there would not be a sufficient increase in their production to justify the cost. This was communicated to Raybond during the course of the next several weeks, primarily by telephone conversations between Wist and D. Racoosin (Racoosin), President of Raybond, who had now become personally involved in the negotiations.

While the negotiations were continuing with Raybond, Glen-Mar had been checking the feasibility of the general concept with Mann-Russell Electronics, Inc., of Tacoma, Washington, another leading manufacturer of high-frequency heating equipment. The results of this inquiry were fa-

vorable. Glen-Mar was also exploring the means of financing the project with the Valley National Bank. A letter to the bank on November 17, 1969, indicated a thorough exploration by Glen-Mar of the project in question, including a patent search on the total process.

It was during this period, between the meeting on September 22, 1969, and the final consummation of the contract on January 7, 1970, and February 23, 1970, that the top-level management of Raybond and Glen-Mar became personally involved in the final details of the negotiations. After the September meetings Glen-Mar, with Mardian participating in the decision-making process, insisted that there be a guarantee of the ten-second heating cycle. Without the production of a door every ten seconds, Glen-Mar would realize no appreciable increase in production. This was communicated to Racoosin by telephone.

By letter of November 19, 1969, Racoosin, as chief executive officer of Raybond, confirmed in writing what he had already indicated by telephone, to wit, that he was not convinced that an absolute ten-second heating cycle was possible under production conditions and was only willing to guarantee a 19-second cycle. Even this guarantee was not absolute, but limited itself to a special agreement allowing Glen-Mar to return the generators within three months after delivery and receive back two thirds of the purchase price. The offer of October 3, 1969, as modified and supplemented by Racoosin's letter of November 19, 1969, was unacceptable to Glen-Mar and Raybond was so informed.

Discussions began again between Wist and Erz. As a result, a test was set up at a company in North Carolina that had a Raybond press for curing wooden doors. The press was smaller and had a smaller generator, and it only introduced heat to one side of a door at a time, instead of both sides as contemplated by the sytem envisioned for Glen-Mar. Nevertheless, both Glen-Mar and Raybond felt the test

would be helpful. The components of the door were cut down to two-fifths of their actual size. The test was carried out and both Wist and Erz were favorably impressed. The time cycle varied from four to ten seconds, and probably averaged six to seven seconds.

After the test there were additional discussions, particularly between Racoosin and Wist, regarding the ten-second time cycle and Glen-Mar's need for a guarantee. On December 16, 1969, Erz submitted to Wist a new offer consisting of substantially the same letter and quotation as sent on October 3, 1969, with one significant addition. In response to Glen-Mar's insistence of an absolute guarantee of the ten-second cycle, the following special agreement was included:

### "SPECIAL AGREEMENT"

"Glen-Mar Door Mfg. Co. may return the two 50KW output generators, freight prepaid, anytime within 3 months of delivery, if the heating cycles exceed *10 seconds* on hollow core doors. If the generators are returned, Raybond will credit Glen-Mar Door Mfg. Co. with ⅔rds of the original sales price.

"If the generators are not returned within 3 months of delivery, this shall constitute complete acceptance." (Exhibit 1, emphasis in original)

Glen-Mar reviewed the proposal, finalized their financing with the bank in a letter of glowing terms regarding the possibilities of the project, and on January 7, 1970, forwarded to Raybond their purchase order as per Raybond's quotation RAY–274 dated December 16, 1969, for the two generators. They included in their purchase order a modification of the special agreement set forth above by deleting the last sentence thereof and requesting an acknowledgement by Raybond. Racoosin acknowledged the order and accepted the modification of the special agreement by letter and written acknowledgement on February 23, 1970. On February 9, 1970, Glen-Mar contracted with Burge for the construction of the press

and handling system, including responsibility for making it operable.

The generators were shipped to Burge on April 28, 1970, and the construction of the press and handling system began. A portion of Glen-Mar's facilities were set aside for the project. While the evidence indicates that it was Glen-Mar's intention to totally convert to the system when it became operable, it is clear that production continued at substantially its former level during construction and testing of the new system.

In spite of the considerable efforts of Glen-Mar, Raybond and Burge, both in terms of personnel and money, for over a year, the system could not be made operable according to the terms of the contract. While several hundred doors were cured successfully over the testing period, the longest continuous run before a breakdown of some sort occurred was from 50 to 75 doors.

## II.

After hearing the equivalent of approximately one thousand pages of oral testimony and reviewing some sixty exhibits, the trial court made the following ruling regarding the clause set forth, supra, purporting to limit Raybond's liability for consequential damages:

"THE COURT: It's clear to me, from the evidence, *that the overriding tone of the negotiations was this system will work, whether it will produce ten doors a minute, or a door every ten seconds, a door every 12 seconds, a door every 19 seconds, we don't [sic] know it will work, but we don't know how many doors a second, how many seconds it will take to produce a door.*

· "The thing that is the most helpful is the County Asphalt case [County Asphalt, Inc., v. Lewis Welding & Engineering Corporation, S.D.N.Y., 323 F. Supp. 1300, affirmed 444 F.2d 372 (2nd Cir. 1971), infra], where it states three situations under which a limitation of damages would be unconscionable, even in a commercial setting, and *the first one is where one party has been misled as to the nature of the bargain and I think that's what we have here. I think plaintiff was misled* and I don't know that you need to get into fraud, *but I think plaintiff was misled as to what the agreement was.*

"And, for that reason, I think the limitation of damages is unconscionable. *The misleading had to do with the fact that the thing would produce. Not how many, or at what time interval, but the thing was operational and would produce, to me, is different from the agreement which they made, of how frequently, and how often it would produce a door. To me, that is the clue,* and I don't think we need to get into fraud, estoppel, waiver, it's the only thing that makes sense to me out of all the cases that have been submitted as to what the elements of unconscionability are in a commercial setting. And, I don't think we have to go into bargaining power at all.

"Based on that condition, and the County Asphalt case [supra], the Court holds that the limitation of damages here is unconscionable." R.T. Vol. V., Pages 882–884 (emphasis supplied).

Construing the evidence in a light most favorable to upholding the lower court's decision, it does not support the court's basis for its ruling on unconscionability. See, e. g., Krisko v. John Hancock Mut. Life Ins. Co., 15 Ariz.App. 304, 488 P.2d 509 (1971).

The "overriding tone" of the negotiations was not that the system will work, but that it must produce a door with the glue properly cured every ten seconds or less. As the negotiations got down to the final stages, involving the highest level of management of both corporations, this fact became very clear. Whatever euphoria may have permeated the sales personnel, the engineering staff, and the production people regarding the great possibilities of this new system, top management at Glen-

Mar wanted an absolute guarantee of the ten-second cycle. Top management at Raybond was unwilling to give such a guarantee. As indicated by Racoosin, Raybond's president, in his letter of November 19, 1969, supra, (Exhibit 36):

"The heating time cycle of 10 seconds for 4′ x 8′ doors may be achievable in a laboratory but is too optimistic for usage under production conditions."

In this letter he offered his best guarantee at that time by way of the special agreement whereby if the system did not produce a door every 19 seconds or less Glen-Mar could return the generators and get two thirds of its money back.

The 19-second time cycle was wholly unacceptable and negotiations and tests continued, aimed solely at the achievability of a ten-second cycle. On December 16, 1969, Raybond, apparently sufficiently satisfied that a ten-second cycle was within the realm of possibility, resubmitted their original offer with the addition of the special agreement that if they didn't produce a heating cycle every ten seconds, Glen-Mar could return the generators and get two thirds of its money back. Except for the rejection of the three-month limitation on return as being total acceptance, Glen-Mar accepted this guarantee.

There is absolutely no evidence in the record that anyone involved in the project attempted to make the system merely produce or "work at all." There was no direction, either verbally or by any reading of the written documents, to try and make the system produce "a door every 12 seconds," or "a door every 19 seconds." This was, by any reading of the record, both testimonial and documentary, an all-or-nothing project; a door every ten seconds or less, or take back the generators. All design, engineering, construction, and production efforts were aimed at this standard, and nothing less. To hold that Raybond would somehow be better off in the courthouse if it had given less than its best efforts to make the system work as de-

scribed in the contract and specifications, and thereby had obtained a system which produced a door every 12, 15, or 20 seconds (a system which according to the testimony would have been as economically worthless to Glen-Mar as the one that wouldn't produce at all) would do violence to both the tort and the contract concepts of the law before us.

The trial court apparently relied upon the district court opinion in *County Asphalt,* supra, since the only issue regarding unconscionability raised on appeal to the Second Circuit was whether there was a right to a jury verdict on the question (Id., 444 F.2d at pp. 378–379), and that is not at issue here. This language of the district court was decisive:

"Typical cases where a contract or clauses thereof are 'unconscionable' are *where one party has been misled as to the nature of the bargain,* where there appears to have been a severe imbalance in bargaining power, or where specific terms appear 'outrageous.' While these situations occur more frequently in non-commercial settings, the existence of a commercial setting is not of itself sufficient insulation against a charge of unconscionability. However, it is the exceptional commercial setting where a claim of unconscionability will be allowed, *absent undiscoverable 'latent defects.'*" *County Asphalt,* supra, 323 F. Supp. 1308 (emphasis added).

Although the court in *County Asphalt,* supra, found no party to have been either "misled" or victimized by "undiscoverable latent defects," the trial court in this case found otherwise.

While the standards regarding unconscionability set forth in the *County Asphalt* decision, supra, are by no means either exhaustive or exclusive [see generally: Ellinghaus, In Defense of Unconscionability, 78 Yale L.J. 757; Terry and Fauvre, The Unconscionability Offense, 4 Ga.L.Rev. 469; Spanogle, Analyzing Unconscionability Problems, 117 U.Penn.L.Rev. 931; and

cases cited therein] they were used by the trial court and are sufficient for the case at bar.

To hold that Glen-Mar was "misled" by the fact that the system ended up not working at all, or that this apparent total failure was an "undiscoverable latent defect" flies in the face of the facts. There can be no serious contention that Glen-Mar was not aware that the system might not be capable of producing a door every ten seconds. It was not misled as to this possibility, nor could it have been argued that such a failure would be, of itself, an undiscoverable latent defect. Specific provision was made in the ultimate written contractual documents for this possibility. There is no evidence that there was either a contractual obligation or any other form of duty to try and make the system work at less than one door every ten seconds. There was, in fact, no effort to make the system actually operate at a capacity other than one door every ten seconds. In view of the fact that no reason was arrived at explaining why the system didn't produce a door every ten seconds, it is just as probable that it didn't work at all because everyone tried his best to make the system produce a door every ten seconds as opposed to trying to produce less doors. There is no evidence that the system would not produce doors every 12 seconds, or 15 seconds, or 20 seconds. Maximum efforts to perform up to contractual commitments should be applauded, not condemned.

Much is made of the glowing claims and hopes expressed by sales engineering and production personnel of both companies, but particularly Raybond. Yet the unmistakable conclusion is that top management of both companies were well aware of the problems and their respective requirements on the one hand, their limitations on the other, and they insisted both aspects be taken into consideration in the final contractual agreements.

Even though the trial court did not resolve the case on this precise point, it is equally clear that from the standpoint of both the bargaining position and the anticipated results and potential damages, the case at bar is more analogous to Southwest Forest Industries, Inc., v. Westinghouse Electric Corporation, 422 F.2d 1013 (9th Cir. 1970) than Steele v. J. I. Case Co., 197 Kan. 554, 419 P.2d 902 (1966). We have here, as in Southwest, two large corporations with a demonstrated capacity for negotiating as well as for engineering and feasibility research, dealing with each other in an atmosphere where no economic pinch existed requiring that some contractual arrangement be made in a hurry. The evidence also clearly reflects that Glen-Mar was used to dealing with clauses limiting its own damages and certainly had ready access to lawyers when it felt need of them. In this respect, two most crucial and decisive factors in *Steele* are absent here. Steele was an individual consumer pitted against a large corporation (see generally: A.R.S. § 44–2398) and he had growing crops that would be lost if not harvested by the machines he bought and the corporation knew it.

■ Glen-Mar and Raybond both anticipated the machine in question might not produce. Glen-Mar set aside only a small portion of its plant to test the machine, not intending to shift its production until the machine proved out. Raybond anticipated the possibility of having to take its equipment back after testing and return two thirds of the purchase price. Unfortunately, that's exactly what happened. Whatever words and phrases might be urged—reliance, misled, latent defects, developmental, experimental, undiscovered problems—the record doesn't support either a factual or a legal picture which would entitle anyone to be unduly surprised at the result or seek special remedies not clearly and carefully included in the contract as negotiated.

## II.

It is urged that the hearing on the matter of unconscionability, being solely a question for the court, ought not to have

been presented before the jury. Even though the issue is not likely to present itself again in this case, since we agree that such a presentation before the jury is not contemplated by the statute and would be highly prejudicial in resolving other issues properly before the jury, we reach the question here.

■ Section 2–302 of the Uniform Commercial Code is found in our statutes as A.R.S. § 44–2319:

"§ 44–2319. Unconscionable contract or clause"

"A. If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

"B. When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination. Added Laws 1967, Ch. 3, § 5."

The official commentators on this section of the Code give the clear direction that:

"The present section is addressed to the court, and the decision is to be made by it. The commercial evidence referred to in subsection (2) [A.R.S. § 44–2398(B), supra] is for the court's consideration, not the jury's. Only the agreement which results from the court's action on these matters is to be submitted to the general triers of the facts." Uniform Laws Annotated, U.C.C. § 2–302, Official Comment # 3.

Indeed, without this direction, the admonition of subsection (A), supra, to the court

to be selective in its enforcement of contracts, after excising any unconscionable clauses or portions thereof, would be either ineffectual or very dangerous, or both. It was the obvious intention of the drafters and our Legislature that the court have the widest latitude in hearing evidence on the issue of commercial setting in cases where unconscionability was claimed, either in whole or in part. See U.L.A., U.C.C. § 2–302(2), Official Comment # 3, supra; Central Budget Corp. v. Sanchez, 53 Misc. 2d 620, 279 N.Y.S.2d 391 (1967).

■ In this context, while serious questions can be raised, and have indeed been raised here, concerning the admissibility of some of the evidence under general contract law terms (the parol evidence rule), the trial court was obviously correct in allowing the widest latitude in receiving evidence on the issue of commercial setting and unconscionability. If the jury was present, as in our case, the court must, regardless of how the ruling goes, then go back and determine what evidence is still admissible on the contract, either as originally made or as reformed by the court as a result of its ruling; and the court must also admonish the jury that as to what evidence it has heard it may no longer consider and what portions, if any, of the contract are not enforceable, and why. These efforts are at best difficult and confusing, and at worst utterly futile and highly prejudicial of any rational ruling on the complex issues the jury should actually be considering. Cf. Silver King of Ariz. M. Co. v. Kendall, 23 Ariz. 39, 201 P. 102 (1921); Tucker v. Reil, 51 Ariz. 357, 77 P.2d 203 (1938). This statute was designed to minimize these kinds of evidentiary problems trial courts and juries are forced to face with all too much regularity anyway, and it must be so construed.

### III.

Other questions are raised, but in view of our holding on unconscionability, only two need be mentioned, and then only briefly.

We have reviewed the record carefully and find the court was correct in its conclusion that there was no evidence upon which to justify the submission of an instruction on contributory negligence. Sax v. Kopelman, 96 Ariz. 394, 396 P.2d 17 (1964); Nagle v. Conger, 10 Ariz.App. 91, 456 P.2d 411 (1969). In fact, in our view of the record, it is very difficult to justify the submission of any issue of the case on a negligence theory. There simply is no evidence of a breach of duty, either created by the contract, or otherwise, or of the failure to perform up to any standard established by the evidence.

## CROSS APPEAL

Reviewing only the evidence before the trial court at the time of its ruling dismissing the parent corporation, Willcox & Gibbs, we find ample support for its decision regarding the incidents of control over Raybond in its negotiations and attempted fulfillment of the contract in question. We express no opinion here, nor do we deem the issue to have been determined by the trial court, as to the role of Willcox & Gibbs and its other corporate subsidiaries, in the dissipation of any of Raybond's assets that ought to be subject to an unsatisfied judgment, if any, which may ultimately survive in this cause of action.

## CONCLUSION

The dismissal of the parent corporation, Willcox & Gibbs, from this cause is affirmed. The verdict of the jury and the judgment of the trial court entered thereon against Raybond are reversed and this cause is remanded to the trial court for further proceedings consistent with views expressed in this opinion.

WREN, P. J., and HAIRE, J., concur.

NOTE: Judge DONALD F. FROEB having requested that he be relieved from consideration of this matter, Judge HAIRE was called to sit in his stead and participate in the determination of this decision.