**JIG THE THIRD CORPORATION,**
**Plaintiff-Appellee,**

**v.**

**PURITAN MARINE INSURANCE UNDERWRITERS CORPORATION et al., Defendants-Third-Party Plaintiffs-Appellees,**

**ATLANTIC MARINE, INC.,**
**Third-Party-Defendant-Appellant.**

**James I. GEORGE, Jr., et al.,**
**Plaintiffs-Appellees,**

**v.**

**ATLANTIC MARINE, INC.,**
**Defendants-Appellants.**

**JIG THE THIRD CORPORATION et al., Plaintiffs-Appellees,**

**v.**

**Y. E. HALL, INC., Defendant-Third-Party Plaintiff-Appellee,**

**ATLANTIC MARINE, INC.,**
**Third-Party-Defendant-Appellant.**

**No. 74–2709.**

United States Court of Appeals, Fifth Circuit.

Sept. 15, 1975.

Rehearing and Rehearing En Banc Denied Oct. 20, 1975.

W. T. Womble, Houston, Tex., Marshal Graham, Harlingen, Tex., George D. Gabel, Jr., Jacksonville, Fla., for Atlantic.

Paul Q. O'Leary, Paul Y. Cunningham, Jr., Brownsville, Tex., for Puritan Marine Insurance Underwriters Corp. & Y. E. Hall, Inc.

Before GOLDBERG, CLARK and GEE, Circuit Judges.

GOLDBERG, Circuit Judge:

On August 28, 1971, M/V PRINCESS KE AH SOM PAH, a shrimp boat, sank in 15 fathoms of water in the Gulf of Mexico south of Port Aransas, Texas. There was no loss of life or personal injury, but the vessel itself and its gear, including its engines, navigational equipment and rigging, were claimed by the sea. The owners of the PRINCESS, James I. George, Jr., James I. George, III and JIG III Corporation [referred to collectively hereafter as JIG III], sued the vessel's manufacturer, Atlantic Marine, Inc., advancing three theories of recovery: one in contract—breach of warranty—and two in tort—negligent design and construction and strict liability.[1] After a trial, the jury found that the sinking of the PRINCESS resulted from a defect in the design or construction of the boat.[2] The jury also found in answer to a special interrogatory that At-lantic Marine was negligent in the "design and/or manufacture of the vessel." Atlantic Marine appeals, contending that JIG III's remedy, if any, must be found within the four corners of the contract of sale. We believe, however, that nothing in that contract can be construed to exonerate Atlantic Marine of liability for its own negligent design or construction of the PRINCESS, and we affirm the jury's verdict on that basis.

I

At trial, JIG III endeavored to prove that Atlantic Marine had negligently designed and constructed the PRINCESS' shaft assembly, and that this negligence was the proximate cause of the vessel's untimely demise. Plaintiff's several expert witnesses testified that Atlantic Marine's utilization of a 4½-inch, cold-rolled steel shaft instead of the standard 4-inch, stainless steel shaft for its boats was very unsound, and that this design was not approved by the American Bureau of Shipbuilders. These witnesses also noted other defects in the shaft assembly. Finally, JIG III showed that three other Atlantic Marine-built shrimpboats of similar design had either sunk or suffered serious damage as a result of the same sort of malfunction as that which led to the loss of the PRINCESS. In sum, especially considering the fact that upon review of the sufficiency of the evidence to support a jury verdict, this Court must view that evidence in the light most favorable to the prevailing party below, Boeing Co. v. Shipman, 5 Cir. (en banc) 1969, 411 F.2d 365, 374, we believe that there was ample evidence to support the jury's finding of negligent design and construction by Atlantic Marine.

---

1. A second suit, *JIG The Third Corp. v. Puritan Marine Ins. Underwriters Corp.*, No. CA 72–B–121, was consolidated in the district court with JIG III's action against Atlantic Marine. A third case, *JIG The Third Corp. v. Y. E. Hall, Inc.*, No. CA 73–B–142, was apparently not consolidated but affected the judgment below. In each case, the defendants impleaded Atlantic Marine as a third-party defendant.

Prior to trial, Puritan, JIG III's apparently insolvent insurer, entered into a consent decree with JIG III for the limit of its policy, $90,000. The district court's order accepting this settlement is not disturbed by our opinion.

2. The shaft assembly was defective in design or construction; the defect caused severe leakage which eventually sunk the PRINCESS.

Atlantic Marine contends, however, that whatever the evidence may have been, it ought not to have been submitted to the jury, for in the particular circumstances of this case, JIG III must obtain recompense on a contract theory or not at all, so that there was properly no tort theory for the jury to consider. Atlantic Marine reasons that where, as here, the genesis of the relationship between two parties is contractual in nature, where the parties are of relatively equal bargaining power, and where the only loss complained of is the loss of the chattel which was the subject of the contract, the aggrieved buyer is limited to the remedies afforded by that document. This result is said to be the only proper one because the buyer and seller in such a situation clearly intended that all their future relations with respect to the chattel should be governed by the terms of the bargained for contract of sale, and because another result, that is, the availability of a tort action to the buyer, would upset the finely-tuned economic calculations which underlay the making of the initial agreement.

█ We preface our discussion of this issue by pointing out that the law governing the existence of any tort-based cause of action here is the general maritime law. When an ocean-going shrimpboat sinks in 15 fathoms of water in the Gulf of Mexico and the sinking is allegedly tortious, there is maritime locality plus a significant relationship to traditional maritime activity, and the tort, if recognized by the law, is maritime in nature. *See Executive Jet Aviation, Inc. v. City of Cleveland,* 1972, 409 U.S. 249, 268, 93 S.Ct. 493, 505, 34 L.Ed.2d 454, 467;[3] *In re Motor Ship Pacific Carrier,* 5 Cir. 1974, 489 F.2d 152, 154–55, *cert. denied sub nom. Union Camp Corp. v. Gypsum Carrier, Inc.,* 417 U.S. 931, 94

S.Ct. 2643, 41 L.Ed.2d 235; *Union Oil Co. v. Oppen,* 9 Cir. 1974, 501 F.2d 558, 560–63. This would be true even though the conduct complained of may have been negligent construction or defective design and may have occurred ashore. *See Watz v. Zapata Off-Shore Co.,* 5 Cir. 1970, 431 F.2d 100, 112–14; *Oppen v. Aetna Ins. Co.,* 9 Cir. 1973, 485 F.2d 252, 256. Of course, under certain circumstances and on familiar conflicts principles, a court applying the general maritime law might look to the law of a particular state when that state has strong contacts with the parties or other legitimate interests. This would be especially appropriate when the relationship of the allegedly tortious behavior to traditional maritime behavior is enough to confer admiralty jurisdiction but is, in the main, slight. *See Watz v. Zapata Off-Shore Co., supra.* When, however, as in this case, the allegedly tortious act or omission causes an oceangoing vessel to sink on the high seas and the act occurred during the shipbuilding process, the interests of admiralty overbalance those which any state might have.

█ The basic difficulty with Atlantic Marine's contention that JIG III's grievance against it must be resolved solely within the bounds of their contractual relationship is that torts ordinarily are not considered to constitute a part of any contractual relationship. On the contrary, the common assumption is that parties intend their contractual relations to be governed by the law of contract, and their tortious relations, if any, to be governed by the law of torts; this is true even if the tortfeasor is a seller, the victim the buyer, and the only loss is property damage to a chattel purchased by the buyer from the seller. As Dean Prosser remarks:

3. *Executive Jet,* of course, was more concerned with admiralty jurisdiction than with the question of what law was applicable. As we have noted, however:

  Choice of law questions raised in a maritime context have traditionally been analyzed in jurisdictional terms . . . because as a

general rule "[o]nce admiralty jurisdiction is established, then all of the substantive rules and precepts peculiar to the law of the sea become applicable.
*In re Dearborn Marine Service, Inc.,* 5 Cir. 1974, 499 F.2d 263, 277 n. 27, reh. denied, 5 Cir. 1975, 512 F.2d 1061.

There can be no doubt that the seller's liability for negligence covers any kind of physical harm, including not only personal injuries, but also property damage to the defective chattel itself. W. Prosser, The Law of Torts § 101 at 665–66 (4th ed. 1971). Numerous recent cases have demonstrated that a manufacturer's negligent design or manufacture of a product gives rise to a cause of action in tort, even where the aggrieved buyer is the economic equal of the seller and where the only damage is to the purchased chattel itself. *See, e. g., Sterner Aero AB v. Page Airmotive, Inc.,* 10 Cir. 1974, 499 F.2d 709; *Keystone Aeronautics Corp. v. R. J. Enstrom Corp.,* 3 Cir. 1974, 499 F.2d 146; *Continental Grain Co. v. Fegles Const. Co.,* 8 Cir. 1973, 480 F.2d 793; *Neville Chemical Co. v. Union Carbide Corp.,* 3 Cir. 1970, 422 F.2d 1205, cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55.

Atlantic Marine suggests, however, that whatever the law may once have been, the Uniform Commercial Code's implied warranty of merchantability, U.C.C. § 2–314,[4] has subsumed the tort of negligent design and manufacture, thus turning a tort claim into a contractual one. We believe that this argument fundamentally misapprehends the distinction between tort and contract, for it assumes that the "former" tort of negligent design and manufacture was really nothing more than a sort of quasi-contractual warranty of non-negligent design and manufacture. While such a legal abstraction might well provide the missing link in products liability law, we have been unable to find any precedential traces of this creature, and we conclude that it has never existed in corporeal form. Dean Wade recently addressed this same problem and reached this result, reasoning that the complete absence of any U.C.C. provisions dealing specifically with negligence is "quite significant," for at the time of the Code's adoption, the law of products liability—including a seller's liability for negligent design and manufacture—was well-established, so that if the U.C.C. had been intended to supplant the law of negligence, its framers would certainly have said so. Dean Wade believes that the legislative history of the U.C.C. firmly supports his—and our—conclusions.[5] *See* Wade, Is Section 402A of the Second Restatement of Torts Preempted by the U.C.C. and Therefore Unconstitutional?, 42 Tenn.L.Rev. 123, 131–35 (1974).

The admiralty courts have followed the general rule that a tort cause of action exists in a situation such as that presented by this case. *See Houston-New Orleans, Inc. v. Page Engineering Co.,* E.D.La.1972, 353 F.Supp. 890, 899; *Sears, Roebuck & Co. v. American President Lines, Ltd.,* N.D.Cal.1971, 345 F.Supp. 395, 402; *Taisho Fire & Marine v. Vessel Montana,* N.D.Cal.1971, 335 F.Supp. 1238, 1239; *Dudley v. Bayou Fabricators, Inc.,* S.D.Ala.1971, 330 F.Supp. 788, 791; *cf. Alcoa S. S. Co. v. Charles Ferran & Co.,* 5 Cir. 1967, 383 F.2d 46, 50, cert. denied, 1968, 393 U.S. 836, 89 S.Ct. 111, 21 L.Ed.2d 107; *see also Schaeffer v. Michigan-Ohio Navigation Co.,* 6 Cir. 1969, 416 F.2d 217, 221;

---

4. Section 2–314 provides:

   (1) Unless excluded or modified (Section 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .

   (2) Goods to be merchantable must be at least such as

   (a) pass without objection in the trade under the contract description; and . .

   (c) are fit for the ordinary purposes for which such goods are used . . . . .

   (3) Unless excluded or modified (Section 2–316) other implied warranties may arise from course of dealing or usage of trade.

5. To Atlantic Marine's warning that the availability of a tort action to parties situated as JIG III here will turn every properly contractual breach of warranty case into a tort case, we can only reply that the state of the law is clearly opposed to its position, and observe that there is a great deal of difference between proving that a product does not work and that it has been negligently designed or manufactured. *See, e. g., Weakley v. Fischbach & Moore, Inc.,* 5 Cir. 1975, 515 F.2d 1260; *Ward v. Hobart Mfg. Co.,* 5 Cir. 1971, 450 F.2d 1176; *Raybond Electronics, Inc. v. Glen-Mar Door Mfg. Co.,* 1974, 22 Ariz.App. 409, 528 P.2d 160.

*In re Alamo Transportation Co.,* S.D.Tex. 1970, 320 F.Supp. 631, 634. It follows that JIG III was entitled to present its theory and evidence of negligent design and construction to the jury.

## II

Atlantic Marine also urges that even if JIG III has a tort claim against it, the terms of the shipbuilding contract itself prescribe a specific and exclusive remedy in the event of damage to the PRINCESS. Since the particular loss involved in this case does not fall within the ambit of the contractual remedy, Atlantic Marine reasons, the contract forecloses recovery on the tort claim. Article 7 of the contract provides:

*Article 7—Warranty*

[Atlantic Marine] shall warrant its workmanship and materials for a period of six (6) months after date of delivery to the initial purchaser against defective workmanship and materials, subject to the succeeding provisions hereof. This warranty is limited to the repair or replacement of defective parts and material only, . . . as shall appear to [Atlantic Marine] upon inspection, to have been defective in materials and workmanship. . . . No other warranty of any kind is made or implied by [Atlantic Marine], including any losses of time or resultant damages sustained by the owner, and no recommendation of items by others shall imply or constitute any warranty with respect to those items.

The PRINCESS was delivered to JIG III in the summer of 1969, and the boat was not lost until August, 1971, so it does not appear that JIG III could recover damages under the express terms of the warranty.[6] JIG III contends, however, that the terms of the warranty were an inadequate disclaimer of Atlantic Marine's liability for negligent design

and construction, so that Atlantic Marine's contractual defense must fail.

■■ The general rule is that parties of relatively equal bargaining power may contract for the sale of a chattel whereby the seller disclaims any liability for commercial damage to the product which may result from the negligent design or manufacture thereof. *See, e. g., Continental Grain Co. v. Fegles Construction Co., supra,* 480 F.2d at 793; *Neville Chemical Co. v. Union Carbide Corp., supra,* 422 F.2d at 1216; *Southwest Forest Industries, Inc. v. Westinghouse Electric Corp.,* 9 Cir. 1970, 422 F.2d 1013, 1020, cert. denied, 400 U. S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138; 2 L. Frumer & M. Freedman, Products Liability § 19.07(1). This exception to the ancient principle that a party may not immunize himself from the consequences of his own negligence is predicated upon the consideration that businessmen can bargain over which party is to bear the risk of damage and set the price accordingly, thus achieving a more rational distribution of the risk than the law would otherwise allow. *See Delta Air Lines, Inc. v. McDonnell Douglas Corp.,* 5 Cir. 1975, 503 F.2d 239, 242–43, cert. denied, 1975, 421 U.S. 965, 95 S.Ct. 1953, 44 L.Ed.2d 451; *Potomac Electric Power Co. v. Westinghouse Electric Corp.,* D.D. C.1974, 385 F.Supp. 572, 579; *Royal Indemnity Co. v. Westinghouse Electric Corp.,* S.D.N.Y.1974, 385 F.Supp. 520, 524–25. The rationale presupposes that the contracting parties have in fact considered the relative costs of insuring against negligent design and manufacture and have incorporated their conclusions into the contract. For this reason, although a seller's disclaimer of negligence will be enforced where the contract specifically mentions "negligence," "tort" or cognates thereof, *see, e. g., Delta Air Lines, Inc. v. McDonnell Douglas Corp., supra,* 503 F.2d at 242–43; *Philco*

---

6. JIG III argues that the disclaimer of warranty is insufficient even as a contractual defense because the provision was inconspicuous and did not specifically disclaim the implied warranty of merchantability. In view of our disposition of this case, we need not resolve this issue.

Corp. v. "Automatic" Sprinkler Corp., 7 Cir. 1964, 337 F.2d 405, 407; *Potomac Electric Power Co. v. Westinghouse Electric Corp., supra,* 385 F.Supp. at 575–77; *Royal Indemnity Co. v. Westinghouse Electric Corp., supra,* 385 F.Supp. at 524–25; *Iowa Electric Light and Power Co. v. Allis-Chalmers Mfg. Co.,* S.D.Iowa 1973, 360 F.Supp. 25, 33, the courts will not enforce a disclaimer of negligent design and manufacture, even in a commercial context, unless the contractual language is clear and unequivocal.[7] *See, e. g., James F. O'Neil Co. v. U. S. Fidelity & Guaranty Co.,* 5 Cir. 1967, 381 F.2d 783, 786; *Sterner Aero AB v. Page Airmotive, Inc., supra,* 499 F.2d at 714; *Keystone Aeronautics Corp. v. R. J. Enstrom Corp., supra,* 499 F.2d at 150; *Gimbel Brothers, Inc. v. William H. Vanderherschen, Inc.,* 3 Cir. 1972, 468 F.2d 597, 599; *Neville Chemical Corp. v. Union Carbide Corp., supra,* 422 F.2d at 1217–20; L. Frumer & M. Freedman, *supra,* § 19.07(1).

■ We have been unable to discover any prior case involving a maritime tort claim based upon the negligent design and construction of a chattel where the buyer and seller thereof enjoyed relatively equal bargaining power and where the only damage was to the purchased article itself. We are thus faced with another choice of law problem, for although the terms of the warranty here were introduced as a defense to a maritime tort claim, contracts to build ships are not generally considered to be mari-

time in nature. *Kossick v. United Fruit Co.,* 1961, 365 U.S. 731, 735, 81 S.Ct. 886, 890, 6 L.Ed.2d 56, 60–61; *Hollister v. Luke Construction Co.,* 5 Cir. 1975, 517 F.2d 920, 921; *Richard Bertram & Co. v. Yacht Wanda,* 5 Cir. 1971, 447 F.2d 966, 967. In other words, there is some question as to whether the general maritime law or Florida law should apply here, since Florida was the state in which the shipbuilding contract was made and performed. On the one hand, a concern for the uniformity of the law to be applied in the resolution of controversies founded on maritime torts militates in favor of construing this contract according to maritime principles. Furthermore, it might seem anomalous to hold that JIG III's case-in-chief must be interpreted according to general maritime principles, but that Atlantic Marine's defense is grounded in the law of Florida. On the other hand, since the contract was made and the PRINCESS built in Florida, it is certainly plausible to assume not only that Florida has a considerable interest in the resolution of this case, but also that the parties themselves expected that their contractual relations would be governed by Florida law. Fortunately, we need not decide this question, for we know that Florida requires clear and unequivocal disclaimers of liability for negligence in cases such as this one, *see Ivey Plants, Inc. v. FMC Corp.,* Fla.App.1973, 282 So.2d 205, 209; *cf. University Plaza Shopping Center v. Stewart,* Fla.1972, 272 So.2d 507, 511, and we are convinced that the general maritime law should not

---

**7.** The various jurisdictions are divided in their interpretations of the "clear and unequivocal" rule. Some states, such as New York, require explicit use of the words "negligence," "tort" or their cognates. *See Willard Van Dyke Productions, Inc. v. Eastman Kodak Co.,* 1963, 12 N.Y.2d 301, 239 N.Y.S.2d 337, 189 N.E.2d 693; *Boone Valley Cooperative Processing Assoc. v. French Oil Mill Machinery Co.,* N.D.Iowa 1974, 383 F.Supp. 606, 613–15; *Becker Pretzel Bakeries, Inc. v. Universal Oven Co.,* D.Md.1968, 279 F.Supp. 893, 900; *Pan American World Airways v. United Aircraft Corp.,* 1960, 3 Storey 7, 53 Del. 7, 163 A.2d 582. Other states, such as Illinois, require no specific wording but instead search the contract for a clear expression of the requisite mutual intent, giving

a "fair and reasonable interpretation based upon a consideration of all of its language and provisions." *Tatar v. Maxon Construction Co.,* 1973, 54 Ill.2d 64, 67, 294 N.E.2d 272, 273–74. *See Rutter v. Arlington Park Jockey Club,* 7 Cir. 1975, 510 F.2d 1065, 1066–67; *Gates Rubber Co. v. USM Corp.,* 7 Cir. 1975, 508 F.2d 603, 617. Additional cases expounding the "clear and unequivocal" rule include: *Kansas City Power & Light Co. v. United Telephone Co.,* 10 Cir. 1972, 458 F.2d 177, 179; *Stromberg's v. Victor Gruen & Associates,* 10 Cir. 1967, 384 F.2d 163, 165; *National Motels, Inc. v. Howard Johnson, Inc.,* 4 Cir. 1967, 373 F.2d 375, 379–80; *United States v. Kelly,* 8 Cir. 1956, 236 F.2d 233, 237.

diverge from the general rule in this respect. *Cf. Dow Chemical Co. v. Dixie Carriers, Inc.*, 5 Cir. 1972, 463 F.2d 120, 121; *Jurisich v. United Gas Pipe Line Co.*, E.D.La.1972, 349 F.Supp. 1227, 1229.

When we examine Atlantic Marine's warranty, we find that the shipbuilder made a six-month warranty "against defective workmanship and materials" under which JIG III's remedy was to be limited to the repair and replacement of defective parts and materials. The provision cautioned that "[n]o other warranty of any kind is made or implied, . . . including any losses of time or resultant damages sustained by the owner. . . ." Although Atlantic Marine contends that this language encompasses an adequate disclaimer of negligent design and construction, it is obvious that no specific mention is made either of "negligence" or of "tort liability." Atlantic Marine urges that the phrase "*defective* workmanship and materials" can mean nothing if not "*negligent* workmanship" and "*negligently* selected materials," and argues further that the disclaimer of liability for "losses of time or resultant damage" must also relate to potential losses from negligent design and construction. The problem with this argument is that it equates defects in the boat and losses resulting therefrom with tort liability, whereas it is perfectly possible that a design or part might somehow fail to comply with the agreed specifications and that such a failure could constitute a breach of contract without being tortious. The instant provision could certainly have been adopted with the inten-

tion of applying only to Atlantic Marine's potential contractual liability. *See Neville Chemical Co. v. Union Carbide Corp., supra,* 422 F.2d at 1220. Moreover, Atlantic Marine introduced no evidence at trial to show that the parties intended to alter the general rule of tort liability by allocating the risk of loss to JIG III in return for some diminution in the PRINCESS' price.[8]

In these circumstances, we do not believe that the purported language of disclaimer adequately supports Atlantic Marine's contentions as to the parties' contractual intent. Even assuming *arguendo* that the language of Article 7 is ambiguous, it is certainly not clear and unequivocal in its warning that JIG III thereby waived its common law right to recover any damages to the PRINCESS which might result from Atlantic Marine's negligence. We conclude that Atlantic Marine's contractual defense must fail.

We do not read the Uniform Commercial Code as a categorical imperative exiling or outlawing the law of negligence between contracting parties. While there may be no magic words which are necessary to grant absolution for negligence, we have in this contract no plausible syllabization for such grace. The warranty words call for replacement of parts and materials, which language is not consonant with damage resulting from faulty design because the warranty verbiage is piecemeal in nature, while the tort theory of liability may involve more comprehensive damage. Limiting contractual language and limitless liability predicated upon negligence can coex-

---

**8.** The only evidence of intent on this point was the testimony of James I. George, Jr., who conducted JIG III's negotiations with Atlantic Marine. George stated that when he arrived at Atlantic Marine's shipyard to investigate the possibility of purchasing new boats for his fleet, the PRINCESS was already afloat and awaiting only the installation of her engines and navigational and fishing paraphernalia. As he was discussing the PRINCESS with Atlantic Marine's George Myers, Myers mentioned that the boat was equipped with a 4½-inch, cold-rolled steel shaft instead of the standard 4-inch, stainless steel variety. George had heard that cold-rolled steel was not as reliable a material as stainless steel, and so asked Myers whether Atlantic Marine's design was a safe one. Myers replied: "Jimmy, I don't think you will have any trouble because that's the reason we went from 4-inch to 4½-inch." This testimony certainly does not indicate that JIG III understood the risk involved in the PRINCESS' design and construction, or that JIG III agreed to assume that risk in return for a lower price.

ist in situations such as this one, and this duality can only be foresworn by language which will bear no interpretation other than that the seller shall not be held responsible for his own negligent wrongdoing. One can buy a pig in a poke, but only if the parties fashion their contract and compound their words with the pig's possible infirmities in mind.

Affirmed.

GEE, Circuit Judge (dissenting):

I respectfully dissent, thinking the opinion of the majority confounds the laws of torts and contracts and imports this tangle into the general maritime law. As I have always understood it, the law of torts in its most basic sense imposes general duties upon persons, regardless of their consent and without reference to their agreements. The law of contracts, on the other hand, concerns itself with the enforcement of promises made. Tort relationships between individuals in society are basically fixed, exist for reasons of public policy, and neither are nor should be readily modifiable by individual action. As to sales and purchases and absent government regulation, however, the law of contracts has always recognized that individuals are free to bargain for the quality of what they expect to get. Therefore the law of sales (the branch of contracts with which we are here concerned) does not impose on a seller a greater burden than that which he has agreed to undertake.[1]

It is clear to me that an elaborate contractual relationship exists between JIG III, the purchaser/owner of the *Princess,* and Atlantic Marine, Inc., its manufacturer/seller. It is also obvious that the *Princess,* because of the defective design of her shaft, was not merchantable: she would not have passed without objection in the trade under the contract description as a shrimp boat and was not fit for the ordinary purposes for which shrimp boats are used. Uniform Commercial Code § 2–314(2)(a) and (c) (hereafter U.C.C. or the code). It follows that JIG III has a fine cause of action for breach of warranty under Florida law unless Atlantic Marine successfully disclaimed that implied warranty or unless JIG III failed to give notice of the defect.[2] *See* U.C.C. § 2–316, 2–607(3)(a). It is also possible, although it was not developed at trial, that JIG III could have an action for breach of an express warranty or of the implied warranty of fitness for a particular purpose, if applicable and undisclosed. The damages available to JIG III would, of course, be those provided for by the code as conscionably limited by agreement of the parties. *See* U.C.C. §§ 2–714, 715, 719.

In short, taken together, the commercial law of Florida and the contract adequately define *all* promises, express and implied, and disclaimers of promises which these two economically-comparable parties made one another respecting the *Princess,* its *quality* as well as its specifications and, of course, its price. If promises are made and broken, the code, modified by the contract,[3] provides adequate remedy.[4] There is no occasion

1. Of course, not all of the details of each sales transaction are spelled out in a written or even an oral agreement. Rather, the parties are deemed to have contracted with the applicable commercial law in mind. Thus, many terms are now imposed, unless modified or disclaimed, by Article 2 of the Uniform Commercial Code (in 49 of the 50 states). It is important to note, however, that with certain limited exceptions virtually every term supplied by the U.C.C. is modifiable by the parties. *See* U.C.C. § 1–102(3) and (4). Usually the implied detail is simply displaced if specific provision is made on its subject. Other implied terms, for instance the implied warranty of merchantability, must be specifically disclaimed in a fixed manner—but even these are subject to negotiation.

2. Breach and disclosure of warranty and notice were all issues in the district court. None, however, were submitted to the jury because the trial judge believed that if JIG could not prevail (on the facts) on its tort theories it would also lose on breach of warranty.

3. Or, more correctly, the contract supplemented by the code.

4. If, because of contractual modification of the code's damages sections, it seems that one or the other of the parties is without adequate remedy, it must be remembered that limitations are negotiated. It is possible, of course,

for resort to the law of torts for a right or a remedy. Moreover, allowing the plaintiff here, JIG III, to prosecute its tort cause of action is highly unfair to the defendant, Atlantic Marine, for it allows JIG III simply to ignore all of Atlantic's attempted disclaimers of warranty and limitations of remedies,[5] which disclaimers and limitations were a part of the bargain and are specifically allowed by the jurisdiction most concerned with the contract between these two parties (Florida). These issues have never been decided and now never will be. Yet surely the parties thought these clauses, here cavalierly brushed aside, meant *something*. It also dispenses JIG III from following those commercially reasonable practices, such as notice of breach, demanded by the code.

The majority, rather than looking to the commercial law of the State of Flori-

da, has chosen to look to general maritime, tort law. In so doing it holds that under the general maritime law a manufacturer/seller owes a purchaser with whom it is in a direct and elaborate contractual relationship regarding a product a free-floating duty[6] not to produce a negligently-constructed or designed product. The holding, I emphasize, is *not* that a duty is owed to avoid producing a negligently-designed product capable of causing *personal injury* or damage to property *other than to the product itself;*[7] rather it is that the manufacturer owes the purchaser (in direct contractual relationship) a duty to produce a product so negligence-free that it cannot harm itself.[8] Although there is, admittedly, some slender authority which supports this position,[9] there is equally persuasive (and in my opinion much better reasoned) authority to the contrary.

that certain limitations could be commercially unreasonable, unconscionable, or could fail of their essential purpose. These can be ignored. U.C.C. §§ 2–718, 719.

5. The legal effect of the purported limitations and disclaimers was never passed upon below.

6. Duty is the *sine qua non* of tort liability. In considering whether such liability exists, one must examine what type of duty is owed (the scope) and *to whom*. The "to whom," it seems to me, is of utmost importance here. The situation would be entirely different if JIG III were not in contractual privity with Atlantic Marine. Even the Supreme Court of New Jersey, which has pushed tort recovery for property damage to its prior outer limit in *Santor v. A & M Karagheusian, Inc.,* 44 N.J. 52, 207 A.2d 305 (1965), has recognized that privity is an important factor in the calculus. As a result, it has reserved the question of whether the rationale of *Santor* applies when a purchaser brings a strict liability tort suit against his seller for economic loss or for recovery of diminution in the basis of the bargain. *Heavner v. Uniroyal, Inc.,* 63 N.J. 130, 305 A.2d 412, 424, 426, 427 n. 16 (1973).

The majority's tautological observation that ". . . the common assumption is that parties intend their contractual relations to be governed by the law of contract, and their tortious relations, if any, to be governed by the law of torts; this is true even if the tortfeasor is a seller, the victim the buyer, and the only loss is property damage to a chattel purchased by the buyer from the seller", post at 174, does little to explain from whence the tort

duty arises in the wholly contractual relationship which it describes.

7. The *Princess* was doubtless potentially dangerous to its crew. However, they suffered no personal injury or property damage. Had the majority restricted Atlantic Marine's duty to that of producing a shrimp boat which was not dangerous to persons or external property the injury suffered here (the loss of the *Princess*) would not have been within the risk.

8. As I read the majority opinion, its logic, for instance, would allow the purchaser of negligently-mixed paint which peels to recover its price even though all warranties were conspicuously disclaimed.

9. The majority cites a number of cases, post at 175, as supportive of its position. Of these, *Sterner Aero A. B. v. Page Airmotive, Inc.,* 499 F.2d 709 (10th Cir. 1974) is distinguishable. There the defective product was a replacement engine. The suit, however, sought recovery for damage to the body of the airplane which was clearly distinct from the new engine. The majority also asserts that its holding has been previously embraced a number of times by admiralty courts. However, of the cases cited, post at 175, only one, *Dudley v. Bayou Fabricators, Inc.,* 330 F.Supp. 788 (S.D.Ala.1971) is on point. In *Houston-New Orleans, Inc. v. Page Engineering Co.,* 353 F.Supp. 890 (E.D. La.1972) the defective product was a reinstalled electric control panel. Plaintiff sued for damages caused by the panel, not to it. It was a barge and a crane boom (neither of which was manufactured by Page) which were damaged. In neither *Sears, Roebuck & Co. v.*

*See, e. g., Hawkins Construction Co. v. Matthews Co.*, 190 Neb. 546, 209 N.W.2d 643 (1973). I would follow the logic of the latter and hold that no such tort duty exists in the general maritime law.

There are grey areas where doubt may exist whether the principles of the law of torts or the law of sales control a given case, but this is not one. Just as tort principles clearly control when a consumer, whether or not in privity with a seller or manufacturer, is injured by a negligently-manufactured consumer product, so our case appears to fit squarely within the territory clearly reserved for the law of sales. Here the purchaser/owner was in a direct contractual relationship with the seller/manufacturer. There is no personal injury, and the only damage to JIG III's property is to the hull of the *Princess* and the gear which had, at the time of the accident, become an integral part of the ship. When there is privity, no personal injury, and property damage only to the defective product itself, any remedies which a purchaser might have against his seller/manufacturer should be given by the laws of sales or the particular terms of the contract between the parties, not by the law of torts. The majority's contrary rule, which gives tort law preeminence, mangles the intricate mechanism of the U.C.C. and rewrites past contracts of maritime manufacturers such as Atlantic Marine entirely, changing the negotiated terms concerning the quality of the goods to be delivered. Quality, of course, directly affects price. Both quality and price should be negotiable items, and the law of sales is the framework within which the negotiations should take place—and did take place here. For these reasons I would hold that the general maritime law should not and does not recognize a tort-based, product-liability cause of action based either on negligence or strict manufacturer liability when there is privity and when the only loss suffered results from damage to the defective product itself. In holding that it does, we simply withdraw from the parties, and after the fact, a portion of the freedom to contract which the codifiers meant them to keep.

Fortunately, the rich new legal lode discovered by the majority, which has lain largely unnoticed under the noses of courts for time immemorial—that of tor-

---

*American President Lines, Ltd.*, 345 F.Supp. 395 (N.D.Cal.1971) and *Taisho Fire & Marine v. Vessel Montana*, 335 F.Supp. 1238 (N.D.Cal. 1971) was privity of contract present. In each the plaintiff sued the ship manufacturer/repairer for damage to cargo. Neither plaintiff was a shipowner. Also, obviously, neither suit involved an attempt to recover damages for injury to the defectively-designed ship. The remainder of the cases cited are personal injury suits.

Although Prosser and a number of other commentators state flatly that a seller's tort liability for negligent design includes property damage to the defective chattel itself, most of the cases cited in support of the rule involve situations in which an ultimate consumer has sued a manufacturer and privity of contract is absent. *See* W. Prosser, The Law of Torts § 101 at 665–66 (4th ed. 1971) and cases cited therein. *See* also dissent footnote 6 post at 181. Professor Wade, whom the majority cites, is not entirely satisfied that such a tort duty exists presently.

 Between the situations involved in the last two paragraphs is one which is hard to classify. What happens when the product supplied by the defendant damages itself? Suppose the brakes in an automobile are defective; they fail and the automobile crashes and is destroyed. Suppose the electric wiring system in the car is defective; it develops a short and soon drains the battery so that it has to be replaced. Are these cases to be classified with the first paragraph above or with the second, or do they require a separate classification? One could say that tort recovery is not available whenever the damage is to the product itself. Or he could say that tort recovery is permissible whenever the harm to the product itself is of the "accident" type, as in the first illustration above. There is no clearly correct decision between the two positions. My personal inclination is toward the second one, but it is by no means a conviction.

J. Wade, *Is Section 402A of the Second Restatement of Torts Preempted by the U.C.C. and Therefore Unconstitutional?*, 42 Tenn.L.R. 123, 129 (1974).

tious breach of contract—will likely remain largely unworked. In the normal contract case it does not signify whether the promisor carelessly but fortuitously performs his promise or negligently fails to do so: the question is whether or not he performed it at all. And the alien duties from the world of torts which the majority materializes on JIG's side of the scales in our case may, they say, be disclaimed by contract—and doubtless promptly will be by knowledgeable shipbuilders operating within our reach.[10] And so we will return to the road which we should never have left, contract law, leaving as signs of our passage only a mulcted Atlantic Marine and a pitfall for the uninformed. I would reverse.

10. The court's opinion does stop short of imposing, in the name of public policy, an unwaivable minimum standard of quality, and so of price, in addition to the policy measures thought sufficient by those who drafted the basic U.C.C. and the legislatures which have enacted its various versions.