SYNTHETIC INDUSTRIES, INC.

v.

WHITLOCK, INC., Defendant,

Butler Manufacturing Company,
Third-Party Defendant.

Civ. A. No. C–75–70–R.

United States District Court,
N. D. Georgia,
Rome Division.

June 17, 1977.

Karl M. Kothe, Rome, Ga., for plaintiff.

James D. Maddox, Rome, Ga., for Whitlock, Inc.

L. Hugh Kemp, Dalton, Ga., for Butler Mfg. Co.

## ORDER

HENDERSON, Chief Judge.

This is a diversity action for damages arising from alleged defects in a pair of storage silos sold by the defendant to the plaintiff. The defendant filed a counterclaim for breach of contract and impleaded the manufacturer of the silos' component parts.

The case came on for trial before the court sitting without a jury. Based on the evidence adduced at trial and the parties' arguments and briefs, the court makes the following findings of fact and conclusions of law.

The plaintiff, Synthetic Industries, Inc., is a Chickamauga, Georgia concern which manufactures synthetic yarn and carpet backing. The basic component in this process is resin, originally in crystal form and later transformed into a sheet. The crystallized resin is retained in storage silos until needed when it is then fed into an extruder for processing.

At the time the plaintiff began production in 1967, it had only one silo, purchased from the defendant, Whitlock, Inc. In 1972 it expanded its production facilities, requiring increased storage capacity and acquired two additional tanks from the defendant.

The new silos were erected by the defendant's own workmen and ready for production in September, 1972. Shortly thereafter, the plaintiff experienced problems with the system because of an apparent increase in waste material.

When the resin is channeled from the silo into the extruder, it is melted into a liquid and molded by die into a translucent sheet. It is then cooled, shredded and molded into yarn. If, at the time the resin passes into the extruder, it is in any way contaminated by foreign matter, the resulting sheet will be defective and cause breakdowns in later manufacturing stages. To correct such a malfunction the machinery must be shut down for more than an hour.

After a thorough inspection of the entire system, the plaintiff traced the problem to contaminated resin in the silos and contacted the defendant, which sent a representative to the plant to conduct an inspection. He determined that the silos needed repair and this work was completed at the defendant's direction and cost. The contaminated resin was sold by the defendant to a third party after some difficulty for $11,545.80. The sale proceeds were not remitted to the plaintiff. Of the total contract price of $37,560.00, including silos, other equipment and installation, the outstanding unpaid balance is $17,120.00.

The silos were manufactured by the third-party defendant, Butler Manufacturing Company, and delivered to the plaintiff's Chickamauga plant unassembled. The panels of each tank as shipped are coated with an epoxy covering as a sealant. They are then bolted together at the construction site and a silicone material is applied to the joints as caulking. The roof or deck of the silos is secured by a product called BGT cement.

The examination of the two storage tanks revealed a number of erection deficiencies. Basic to the difficulty was the defective nature of the epoxy coating. Because the factory-applied covering can be scratched during shipping, a "touch-up" epoxy with instructions for field application is furnished to the erectors. It must be applied, however, only to a clean, dry surface or it will eventually flake away. Moreover, if it is not properly used, the silicone sealant later applied to the joints of the tank will not adhere. Both epoxy and silicone had fallen into the tanks.

Finally, the BGT cement with which the roof was attached had oozed through the joints. This material is an effective adhesive only when applied evenly and in small amounts. To prevent any contamination of materials stored in the tanks, the surfaces must be wiped clean to remove any excess cement.

The contract of sale between the plaintiff and defendant contained the following language:

2. Seller warrants that at delivery and installation the equipment will have the capacity to meet the Requirements set forth on the face hereof, provided that Buyer operates the Equipment in accordance with the instructions of Seller. Seller also warrants against defects in material or workmanship in the Equipment, and agrees to repair or replace f. o. b. point of manufacture, any part found by Seller to be defective in material or workmanship within one year from date of shipment. The Seller shall not be liable for any special or consequential damages or loss for breach of the above warranties, the Seller's exclusive liability and the Buyer's exclusive remedy being expressly limited to repair or replacement of defective Equipment or parts thereof under the terms and conditions set out above.

3. THE WARRANTIES CONTAINED ABOVE ARE THE ONLY WARRANTIES MADE BY THE SELLER OR ANYONE ELSE WITH RESPECT TO THE EQUIPMENT BEING SOLD HEREUNDER AND ARE IN LIEU OF ANY OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING BUT NOT LIMITED TO, A WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. NO ORAL WARRANTIES OR GUARANTEES OF ANY KIND HAVE BEEN MADE TO BUYER.

4. The warranties herein shall not be binding upon Seller unless all payments, called for by the terms of this contract, are and continue to be paid on the dates specified.

As originally filed, the complaint sought damages for breach of express warranty, implied warranties of merchantability and fitness for a particular purpose, negligence and fraud and deceit. By order of February 15, 1977 the defendant's motion for summary judgment was granted in part, on the implied warranty claims in Counts Two and Three.

In addition, the defendant filed a counterclaim seeking to recover the unpaid balance of the contract price. The third-party complaints seeks indemnity against Butler Manufacturing Company for defective manufacture.

■ At the outset, there is no question that the defendant is entitled to prevail on its counterclaim. See *Porter v. Davey Tree-Expert Co., Inc.,* 34 Ga.App. 355, 129 S.E. 557 (1925); *cf. Housing Authority v. Ayers,* 211 Ga. 728, 88 S.E.2d 368 (1955). The plaintiff admits its liability for the

contract price in the complaint,[1] but there is a dispute as to the amount of the outstanding balance. The only evidence introduced at trial supports the defendant's claim for $17,120.00.

There is a serious question of whether the plaintiff can depend on the express warranty because the defendant's entitlement to judgment on the counterclaim establishes the plaintiff's failure to comply with Paragraph Four of the agreement, on which the warranties are expressly conditioned. Assuming, *arguendo,* that the plaintiff can so rely, it affirmatively appears from the evidence that the warranty was satisfied, the defendant having made the necessary repairs to the tanks at its own cost.

Although the charges of negligence allege defective design, manufacture, fabrication and installation of the silos, the plaintiff proved only improper erection.[2] The tanks, if properly installed, were capable of storing the resin without contamination. Moreover, the defendant, which had previously sold to the plaintiff its original silo, was at least on notice that its product would be put to similar use. Proof of the flaking silicone and epoxy as well as the defectively applied cement compel the conclusion that the silos were not properly erected by the defendant.

The defendant does, however, seek to avoid liability by contending that the contractual exclusion of warranties and limitation of remedies restricts its obligation simply to repair and replacement of defective materials. The February 15, 1977 order, however, held that the contractual language was not sufficiently broad to preclude recovery for negligence.

Implicit in this determination is a finding that negligence is an available cause of action. None of the parties addressed this basic question but resolution of this action on the merits necessitates its consideration.

As a general rule, breach of contract does not constitute a tort. See *Kenimer v. Ward Wight Realty Co.,* 109 Ga.App. 130, 135 S.E.2d 501 (1964).

[I]n order to maintain an action ex delicto because of a breach of duty growing out of a contractual relation the breach must be shown to have been a breach of duty imposed by law and not merely the breach of duty imposed by the contract itself. . . . "Duty imposed by law" as used in this context means, of course, either a duty imposed by a valid statutory enactment of the legislature or a duty imposed by a recognized common law principle declared in the reported decisions of the appellate courts of this State or jurisdiction involved.

*Mauldin v. Sheffer,* 113 Ga.App. 874, 879, 150 S.E.2d 150, 154 (1966). See *Manley v. Exposition Cotton Mills,* 47 Ga.App. 496, 170 S.E. 711 (1933); *Leonard v. Firemen's Ins. Co.,* 100 Ga.App. 434, 111 S.E.2d 773 (1959). There are two exceptions to this rule.

An implied duty can be imposed solely on the legal incidents of certain professional relationships, for example, physician-patient, *Fincher v. Davis,* 27 Ga.App. 494, 108 S.E. 905 (1921); architect-client, *Housing Authority v. Ayers,* 211 Ga. 728, 88 S.E.2d 368 (1955); contractor-landowner, *Howell v. Ayers,* 129 Ga.App. 899, 202 S.E.2d 189 (1973); attorney-client, *Robinson v. Schly,* 6 Ga. 515 (1849), as well as bailor-bailee and common carrier-passenger. See *Mauldin v. Sheffer, supra* at 879, 150 S.E.2d 150. No authority has been found however, to infer such a relationship here and to do so in the absence of such guidance would create an exception potentially as broad as the rule itself.

Where no special relationship between the parties exists, there is another exception if the breach of contract resulted from the obligor's misfeasance, as opposed to nonfeasance. See *Mauldin v. Sheffer, supra.* The cases do not disclose a principle capable of each application.

---

1. Complaint, Count One, ¶ 9; Count Two, ¶ 7; Count Three, ¶ 10; Count Four, ¶ 5; Count Five, ¶ 5; Count Six, ¶ 6.

2. The defendant's own trial brief contains findings of fact leading to this same result.

For example, in *Orkin Exterminating Co. v. Stevens,* 130 Ga.App. 363, 203 S.E.2d 587 (1973), the court defined as nonfeasance the defendant's failure to control termite infestation, as provided by the contract. Only three years later, the court found a similar breach to constitute misfeasance. *Allred v. Dobbs,* 137 Ga.App. 227, 223 S.E.2d 265 (1976). Efforts to distinguish the two cases are artificial at best. See generally Gregory, Torts, 26 Mer.L.Rev. 221, 226–29 (1974).

The misfeasance-nonfeasance classification is no easier distinguished in other contexts. In *Frank Graham Co., Inc. v. Graham,* 90 Ga.App. 840, 84 S.E.2d 579 (1954), the plaintiff sued an automobile dealer for failure to repair defective brakes. The court expressly approved the plaintiff's election to sue in tort for his resulting injuries but in *Long v. Jim Letts Oldsmobile, Inc.,* 135 Ga.App. 293, 217 S.E.2d 602 (1975), the court, in a similar factual situation, held that the plaintiff's sole remedy was a suit on the contract. See *Unistrut Georgia, Inc. v. Faulkner Plastics, Inc.,* 135 Ga.App. 305, 217 S.E.2d 611 (1975).

■ Perhaps the best way to reconcile the cases is to look to the injury suffered by the plaintiff. If the damage resulted from a breach of a duty independent of the contract and would not have occurred but for the defendant's negligent performance, the plaintiff may elect to sue in tort.

> The "harm" contemplated or the interest protected against by such rule is "bodily harm," injury to "life and limb," injury to others and damage to property other than the product itself. . . . "[W]here there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of value or use of the thing sold, or the cost of repairing it, the courts have adhered to the rule . . . that purely economic interests are not entitled to protection against mere negligence, and so have denied the recovery."

*Long v. Jim Letts Oldsmobile, Inc., supra* at 295, 217 S.E.2d at 604 (citations omitted), quoting in part, Prosser, *Law of Torts* (4th ed. 1971), p. 665. See *Monroe v. Guess,* 41 Ga.App. 697, 154 S.E.2d 301 (1930). See also *E. & M. Construction Co. v. Bob,* 115 Ga.App. 127, 153 S.E.2d 641 (1971).

■ In this case, the plaintiff's injury is composed of two primary elements: excess production costs and contaminated resin. Clearly the damage to the business' profitability represents the pecuniary loss that the cases uniformly hold is insufficient to support a negligence action.

The second part of the plaintiff's hoped-for recovery supersedes mere economic disappointment or inability to reap the "benefit of the bargain." If the plaintiff establishes it is entitled to recoup this loss, it will have proved a cognizable injury independent of contract—property damage—and a suit for negligence will lie.

■ At the time the tanks were emptied in October, 1975, the plaintiff was purchasing resin for fifteen cents per pound. This cost remained relatively constant throughout the period in issue. Although the defendant managed to sell the contaminated product for only $11,545.80, its undamaged value was $28,864.50 and the plaintiff is entitled to recover this latter amount.[3]

Proof of excess production cost is much more difficult. The period in controversy is only one and one-half months, September and the latter half of October, 1972, when the two storage silos were in use. In order to prove this item of damages, the plaintiff compared its cost figures against the preceding ten-month base period.

■ The expense of production alone is an integral part of any business' profits. Although recovery for lost profits is not necessarily precluded in a tort action, see *Georgia Grain Growers Ass'n, Inc. v. Craven,* 95 Ga.App. 741, 98 S.E.2d 633 (1957), such loss must be capable of reasonably

---

3. Computation of the proper sum is a two-step process: first, ascertaining the diminution in value proximately resulting from the defendant's negligence and, second, determining the measure of damages for the defendant's later conversion of the resin.

accurate computation.[4] See *Jacksonville Blow Pipe Co. v. Trammell Hardwood Flooring Co.,* 170 F.Supp. 537 (N.D.Ga. 1958), *aff'd,* 264 F.2d 717 (5th Cir. 1959); *cf. Kingston Pencil Corp. v. Jordan,* 115 Ga. App. 333, 154 S.E.2d 650 (1967); 8 *Encyc. Ga.Law,* Damages, § 24. See also *Tovell v. Legum,* 207 Ga. 193, 60 S.E.2d 339 (1950); *Norris v. Pig 'n Whistle Sandwich Shop, Inc.,* 79 Ga.App. 369, 53 S.E.2d 718 (1949).

As the plaintiff's accountant testified, such a comparison is accurate only to the extent that the costs remained relatively constant throughout the period. Initially, there was much confusion about the accountant's computation prepared from summary financial statements, as opposed to the general ledger sheets.

Rent, utilities, wages and depreciation increased from the ten-month base period to the critical months of September and October, 1972. Part of the difference is undoubtedly due to the expansion of the plaintiff's plant, occasioned by the installation of the new silos and other equipment. There is an additional problem brought on by various accounting deferrals necessitated by the particular method employed.

There was also evidence that the plaintiff's accounting system was changed during the period under scrutiny. As a consequence, all of the costs cannot be verified from the original entries in the ledgers. The plaintiff suggests that compensation for these accounting techniques can be made now by downward adjustments in some of the September and October, 1972 numbers, in effect, resolving all doubts of accuracy against the plaintiff and reducing its claim by approximately $4,000.00.

In a proper case, where the necessary causal connection between the defendant's conduct and the injury for which recovery is sought is proved, this may constitute an appropriate solution to the problem of computation. Beyond the accounting difficulties encountered here, though, it is not at all clear that the excess production costs can be attributed solely or even principally to the defendant's negligence.

The two storage silos were filled with resin for only part of October, 1972. One indication of the plaintiff's excess production costs resulting from the contaminated resin would be the percentage of waste materials as the resin was processed. It would be reasonable to expect that the portion of unusable product would be higher during the latter half of the month when the contaminated resin was being fed into the system.

At the trial, the plaintiff introduced daily resin reports from the extruder department compiled by the department supervisor. Exhibit 6. These papers record the total production of yarn and the amount of waste. By adding and comparing the figures for the first part of October, when the tanks were empty, to the latter part of the month, when the tanks were filled, it appears that the percentage of waste during the former period was slightly higher than for the end of October. This is exactly the opposite result that would obtain if the contaminated resin were a primary cause of the excess production costs.

There is no question that the silos were defectively constructed and that the resin was contaminated thereby. Furthermore, the plaintiff's recovery for the resin sold to a third party by the defendant illustrates the loss in value of the product so adulterated. But the plaintiff's production figures do not necessarily infer that excess costs also followed from the defendant's negligence and, therefore, it failed to carry the burden of proof for this item of damage.

The defendant impleaded Butler Manufacturing Company, alleging that it was negligent in manufacturing the silos' component parts. There was no evidence to substantiate this allegation and, as earlier mentioned, the plaintiff succeeded in prov-

---

4. The case law on recovery of lost profits is not wholly applicable here. Loss of profits requires a forecast as to the monies that might have been earned in the absence of the defendant's negligence. In this situation, however, the plaintiff seeks recovery for sums actually expended and these monies should be capable of much more accurate proof.

ing only negligent erection of the tanks, a function performed by the defendant.

The plaintiff's last count of the complaint contended that the defendant fraudulently induced the sales contract. No evidence whatsoever was admitted to establish this claim and, consequently, it must fall.

To the extent that any findings of fact contained herein shall be conclusions of law and to the extent that any conclusions of law shall be findings of fact, the same shall be considered conclusions of law or findings of fact, as the case may be.

Accordingly, the plaintiff is entitled to recover $28,864.50 and the defendant may have judgment on its counterclaim for $17,-120.00. These amounts will be set off and judgment will be entered for the difference.

Let judgment be entered in favor of the plaintiff against the defendant in the sum of $11,744.50 and in favor of the third-party defendant against the third-party plaintiff, both with costs of the action.[5]

So ordered this the 17 day of June, 1977.

---

**5.** Notwithstanding the fact that the defendant prevailed on its counterclaim, costs are awarded to the plaintiff. Not only is the plaintiff entitled to a larger recovery, but the trial was devoted almost exclusively to the issue raised in the complaint.