**KAISER ALUMINUM & CHEMICAL CORPORATION, a corporation, Plaintiff,**

**v.**

**INGERSOLL–RAND COMPANY, a corporation, and The D. M. Weatherly Company, a corporation, Defendants.**

No. CV479–167.

United States District Court,
S. D. Georgia,
Savannah Division.

March 26, 1981.

A. James Anderson, William H. Stanhope, Robins, Davis & Lyons, Atlanta, Ga., A. Martin Kent, Savannah, Ga., for plaintiff.

Oliver, Maner & Gray, Joseph M. Oliver, Savannah, Ga., Neely, Player, Hamilton & Hines, Edgar A. Neely, Jr., Atlanta, Ga., for D. M. Weatherly Co.

Edward E. Dorsey, Thomas S. Richey, Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for Ingersoll-Rand Co.

## ORDER

B. AVANT EDENFIELD, District Judge.

### I. *Background*

Before the Court are the motions of defendants Ingersoll-Rand Company (Ingersoll-Rand) and D. M. Weatherly Company (Weatherly) for summary judgment.

This litigation concerns the breakdown of an air compressor train. The air compressor train is part of a facility built at Port Wentworth, Georgia for fertilizer production. The air compressor train is utilized to make nitric acid, an important ingredient in the manufacture of fertilizer. The function of an air compressor train is to compress air so that nitric acid may be produced. Air is forced into the train and compressed by use of both rotary blades acting as fans and stationary blades which serve to direct the flow of air. One of these stationary blades, referred to as an inlet guide vane, broke and caused damage to additional parts of the machine resulting in a temporary closing of the nitric acid plant. Kaiser Aluminum and Chemical Corporation (Kaiser) is the owner-operator of the nitric acid plant. Weatherly contracted to build the plant for Kaiser. Ingersoll-Rand supplied Weatherly with the air compressor train used. Kaiser has asserted theories of recovery in this litigation, including theories based on negligence, contract, and fraud against both Weatherly and Ingersoll-Rand.

### II. *The Facts*

There are undisputed facts in this litigation although they are often obscured by the hotly disputed facts. Although the parties disagree on facts related to those listed, a core of agreement appears.

1. Ingersoll-Rand is a manufacturer of air compressor trains. Weatherly is a constructor of nitric acid plants. The two companies have often worked together and have been involved in the construction of five compressor trains for nitric acid plants over a period of years.

2. In late 1973, Kaiser submitted a bid package to Weatherly requesting Weatherly to bid on the construction of a nitric acid plant.

3. After preliminary discussions in late 1973 between employees of Weatherly and Ingersoll-Rand, Weatherly prepared and submitted to Ingersoll-Rand the written performance specifications for the air compressor train. Ingersoll-Rand prepared a written proposal for a compressor train and submitted it to Weatherly in a letter dated December 12, 1973.

4. In a letter dated December 21, 1973, Ingersoll-Rand gave Weatherly a firm price for the compressor train and promised to hold the price at that level until the end of January, 1974 if Weatherly would issue a letter of intent to purchase the compressor. Weatherly responded in a letter dated December 26, 1973 in which it committed itself to the Ingersoll-Rand compressor train subject to Weatherly being awarded the Kaiser contract and Kaiser accepting the use of the Ingersoll-Rand compressor train in its plant.

5. Weatherly submitted a bid proposal for construction of the Port Wentworth plant on January 3, 1974. Kaiser and Weatherly signed a contract for the project on January 31, 1974, after numerous negotiations and meetings between the two had been held.

6. Before Kaiser entered into this contract with Weatherly, it was operating five nitric acid plants. The specifications for the Kaiser Plant in Port Wentworth included an axial air compressor manufactured by Ingersoll-Rand.

7. The contract between Kaiser and Weatherly defined "work" as including design, construction, workmanship and testing. In the contract Kaiser received the right to make additions, changes, deletions, or alterations in the work to be performed by Weatherly.

Kaiser drafted Exhibit "B" to the Purchase Order/Contract with Weatherly which clause prepared by Kaiser reads:

"17. ENTIRE CONTRACT

This purchase order together with any written documents which may be incorporated by specific reference, constitutes the entire agreement between the parties and supersedes all previous communications between them, either oral or written. All such previous communications are hereby abrogated and withdrawn, and no stipulations, representations or agreements by Purchaser or any of its officers, agents or employees shall be binding on the Purchaser unless contained in this Purchase Order or incorporated herein by reference as above-provided and no local, general or trade customs or previous course of dealing or performance shall alter or vary the terms hereof."

Kaiser drafted Exhibit "C" of the Kaiser general conditions for contracts which is part of the Kaiser/Weatherly contract which Kaiser writing reads:

"35. ENTIRE CONTRACT: This Contract contains the entire agreement of the parties and supersedes all negotiations, proposals, notices of award, purchase orders, agreements and under-standings, if any, written or oral, heretofore had between the parties relating to the work. In the event any specification, drawing or exhibit forming a part of this Contract contains terms or conditions inconsistent with these General Conditions, these General Conditions shall control. No amendment, variance or change in the provisions of this Contract shall be made except in writing signed by the authorized representatives of the parties hereto."

8. The Kaiser-Weatherly contract contains a section entitled "General Liability" containing the following paragraph:

"Seller shall not be liable for owner's consequential or contingent damages, loss of production, loss of business or loss of profits."

That section also provides:

"Seller's liability for damages due to defects in materials and workmanship, late completion of the work, and similar damages, exclusive of the liabilities stated in the Performance Guaranty, in the indemnity provisions and in the patent provisions, shall be limited to $200,000."

9. On the day that Kaiser and Weatherly signed their contract, Weatherly issued a verbal purchase order to Ingersoll-Rand for the air compressor train. Later, on February 25, 1974, Weatherly issued a formal written purchase order. There is disagreement as to whether Weatherly's terms or Ingersoll-Rand's terms are the binding contract provisions.

10. Gary F. Merritt was Kaiser's project manager for construction of the nitric acid plant at Fort Wentworth. Mr. Merritt was authorized by Kaiser to receive and transmit information regarding the nitric acid plant.

11. A meeting of representatives from Kaiser, Weatherly, and Ingersoll-Rand was held on February 20th. The purpose of the meeting and its content are disputed.

12. On or after February 20, 1974, Kaiser obtained an installation list which showed each of the nitric acid plants in which Ingersoll-Rand equipment was in use. That installation list showed that the air

compressor set proposed for Kaiser would contain the largest capacity 1,000 frame axial air compressor in that service. It also showed that the next largest unit was the Ultrafertil compressor.

13. On November 12, 1974, at a meeting at the Ingersoll-Rand plant in Phillipsburg, Mr. Merritt discussed with Ingersoll-Rand engineers the fact that the Kaiser unit was the largest capacity compressor in its frame size and that the next largest was the Ultrafertil compressor. Mr. Merritt was told that there had been problems in the Ultrafertil compressor and that modifications were necessary.

14. Attempts to start the plant were begun in early 1976. Operating problems became apparent to Kaiser and Weatherly during these start up attempts and a bona fide dispute arose as to their cause.

15. Even though information had been received by Kaiser concerning both the Ultrafertil failure and the inclusion of larger than usual rotor blades in the first stage of the axial air compressor, Kaiser did the following:

(a) Failed to object, protest, or reject the compressor train, but allowed continued work on the compressor and made efforts to expedite its construction and delivery.

(b) Kaiser made payments on its contract with Weatherly which it knew were to be applied to the compressor train.

(c) Kaiser accepted delivery of the compressor train at its Port Wentworth plant.

(d) Kaiser operated the compressor train and the plant and used the nitric acid it produced.

16. When refractory material was ingested into the expander in March, 1976, Kaiser insisted that Ingersoll-Rand be engaged to repair the expander.

17. In October, 1976, Kaiser entered into a new agreement with Weatherly. This agreement reads in pertinent part:

"A. Kaiser Agricultural Chemicals and D.M. Weatherly Company agree that on September 20, 1976, and thereafter, each of them has fulfilled all their respective, and have no further obligations to each other or to their respective agents, successors or assigns arising from or in any way related to Kaiser Purchase Order No. 510MO48022 and Kaiser Construction Contract No. SA–190 except for (a) the back-charges to Weatherly for Kaiser labor and materials, (b) those items listed in paragraph B scope of work in this agreement, and (c) the payment by Kaiser to Weatherly for the balance due on said purchase order and contract. Kaiser will promptly, upon completion of all Weatherly work listed in paragraph B of this agreement (a) give Weatherly its final acceptance of the nitric acid plant and all work performed by Weatherly pursuant to Kaiser purchase order No. 510MO48022, Kaiser construction contract No. SA–190, and this agreement, and (b) pay to Weatherly the balance due on said purchase order and construction contract.

"C. Both parties agree that all vendor and supplier warranties still in effect on Weatherly work have been passed on to Kaiser effective no later than August 4, 1976, and further agree that all Weatherly's workmanship and material warranties have been fulfilled and that neither party will have any further liability under such warranty.

18. The above described "settlement agreement" became part of the original contract by change order.

19. Kaiser verified the completion by Weatherly of the work to be performed by Weatherly under the "Settlement Agreement."

20. Kaiser made final payment on its contract with Weatherly and took title to the plant.

21. On June 6, 1977, the inlet guide vane fractured and damaged other portions of the axial air compressor. The nitric acid plant was not in operation for a number of weeks.

This core of facts is compiled from statements of fact submitted by the parties to which opposing parties have specifically stated that they do not object.

### III. *Conclusions of Law*

#### A. *The Negligence Claims*

##### 1. *Type of Damage*

Both Weatherly and Ingersoll-Rand argue that they deserve judgment on the counts asserting claims in negligence. As a threshold matter both assert that the type of damage suffered by Kaiser is not cognizable in tort. The June, 1977 incident, from which flow the damages claimed in this suit, consisted of the failure of an inlet guide vane or vanes. This stationary airfoil directs air from the inlet into the rotating blades of the axial compressor. When the inlet guide vane broke off, it was ingested into the compressor causing additional damage. This characterization of the incident is used by the Court for purposes of discussion. However, when the smoke cleared, it is undisputed that no physical damage had occurred to any person or to any object other than the contract goods themselves.[1]

There are two schools of thought concerning the propriety of a negligence action in circumstances where the injury is confined to the defective chattel itself. The view that a party can recover in negligence for property itself is set forth in *Long Manufacturing, N.C. Inc. v. Grady Tractor Co.*, 140 Ga.App. 320, 231 S.E.2d 105 (1976). There, a barn, alleged to be negligently designed, collapsed while it was being moved. There was no damage in addition to the collapsed barn. Recovery was permitted.

The point of view urged by Kaiser also finds expression in *Jig The Third Corp. v. Puritan Marine Underwriters Corporation*, 519 F.2d 171 (5th Cir. 1975), *cert. denied*, 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976) (*Jig III*). There a shrimpboat purchased from the defendant was lost at sea due to defects in design and construction. The Fifth Circuit commented that there is a great deal of difference between proving that a product does not work and that it has been negligently designed and manufac-

tured. Kaiser also quotes Professor Prosser:

> There can be no doubt that the seller's liability for negligence covers any kind of physical harm, including not only personal injuries, *but also property damage to the defective chattel itself*, as where an automobile is wrecked by reason of its own bad brakes, as well as damage to any other property in the vicinity. But where there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of the value or use of the thing sold, or the cost of repairing it, the courts have adhered to the rule, to be encountered later, that purely economic interests are not entitled to protection against mere negligence, and so have denied recovery.

Prosser, *Law of Torts* (4th ed. 1971) at 655.

The opposing view is that if plaintiff finds himself suffering only from the costs of repair to the defective purchased chattel and loss of profits flowing therefrom, he is not entitled to sue in tort. The reasoning behind this view is that when a party faces only repair costs and the consequential damages which arise out of the breakdown, he is in a position which was foreseeable at the time of contract. The party could have protected himself against the very set of facts he faces. Thus, there is little justification for the common law to interfere where the parties have enacted their own private law to cover the contingency of receiving less than their contract set out.

This reasoning has found wide acceptance in the law of Georgia. The leading case is *Long v. Jim Letts Oldsmobile, Inc.*, 135 Ga.App. 293, 217 S.E.2d 602 (1975). There the owner of an automobile tried to sue in tort for loss suffered when his radiator ran hot and blew out the liquid in the radiator. The Court of Appeals refused to allow an action in tort because, even though the defective radiator had ruined the rest of the

---

1. Kaiser states that more than the defective compressor train was involved because the value of the whole plant was diminished as a result of the defects. This is a specious argu-ment since any defective chattel will necessarily reduce in some measure the value of the economic entity of which it is part.

engine, when the smoke cleared, plaintiff had suffered no more than disappointment of his hope to receive the contracted-for benefit. The court distinguished physical damage from "purely economic interests." Physical damage entails damage to something other than the purchased chattel. Although one might point to the ruined engine and describe the damage as "physical damage," the court made clear that such damage was considered "economic" only. The reason given was that the loss was properly described as pecuniary only since nothing more than the loss of value or use of the purchased chattel or the cost of repair was involved.

Of similar import is the decision in *Mike Bajalia, Inc. v. Amos Construction Company, Inc.*, 142 Ga.App. 225, 235 S.E.2d 664 (1977). There the Court of Appeals specifically limited recovery in negligence to the situation in which components supplied by sources other than defendant were damaged by defendant's defective products. "In the case sub judice the plaintiffs may not recover in negligence against [defendant] for damages to building components supplied by [defendant] arising from defects in these same components. *Long v. Jim Letts Oldsmobile, Inc.*" Interestingly, in the same opinion, the court cited *Long Manufacturing* and distinguished it on plaintiff's strict liability claim. Evidently, the court did not find *Long Manufacturing* persuasive on the negligence claim since it did not discuss it in connection with the negligence claim and merely stated that *Long Manufacturing* was not controlling.

Again, in *Henderson v. General Motors Corporation*, 152 Ga.App. 63, 262 S.E.2d 238 (1979) the Georgia Court of Appeals followed *Long v. Jim Letts*. There plaintiff alleged that the entire transmission of his car was ruined when the parking gear pin broke. No action was allowed in strict liability against the manufacturer because loss was "economic" only.

■ In light of the reasoning of the Georgia courts in these cases,[2] the Court does not hesitate to conclude that Georgia would not allow an action in negligence to proceed on these facts against either Weatherly or Ingersoll-Rand. However, a few points need further clarification.

■ First, there is language in *Long v. Jim Letts Oldsmobile* which indicates that an action in negligence in these circumstances in which there is no damage except to the defective chattel cannot exist in the absence of an "accident." However, the Court would read that language to be modified by the rest of the language in the sentence so that, in order to provide recovery in tort, the "accident" must cause damage to something or someone other than the defective chattel. In addition, any reliance on the word "accident" would make an unprincipled distinction under the cases cited. The faulty radiator in *Long v. Jim Letts* caused the rest of the engine to be ruined even though this "accident" occurred over a period of time and perhaps imperceptibly to the observer. Directly analogous is the situation in *Henderson* where the parking gear pin broke causing the rest of the transmission to break down. In the case at bar, the inlet guide vane broke and caused the rest of the compressor to break down. In the final analysis, Kaiser was out the cost of repair, the loss of use of the compressor, and any resulting lost profits.

The Court also reads the language of Professor Prosser quoted above by Kaiser as supporting this conclusion. That language apparently envisions that damage to the defective chattel itself may be recovered *in addition* to other property damage or personal injury. The loss suffered here fits more accurately into his definition of "economic loss."

A few words need to be added regarding each defendant separately. The necessity of a tort theory against Ingersoll-Rand is apparent due to the lack of privity between

---

2. Under the *Erie* doctrine, this Court is, of course, bound to apply the law as it would be implied by the courts of Georgia.

Kaiser and Ingersoll-Rand.[3] Thus, the negligent design theory presents a possible method of breaching the privity hurdle against Ingersoll-Rand. It is true that *Long Manufacturing* is a negligent design case and the cases squarely holding that economic damages only will not support an action for negligence are not negligent design cases. However, the lone existence of *Long Manufacturing* does not persuade the Court that Georgia intended to carve out a wholesale exception to the usual rules for design cases that do not fall under the aegis of § 105–106 Ga.Code Ann. There are remedies should additional harm occur. However, since Kaiser could have contracted with its seller Weatherly to protect itself against the precise harm suffered, the Court sees no reason to expand what it perceives to be the law of Georgia in order to accommodate the claim against Ingersoll-Rand. Nor is the Court persuaded by the decision in *Jig the III Corp. v. Marine Ins. Underwriters Corp.*, 519 F.2d 171 (5th Cir. 1975), *cert. denied*, 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976). There the Fifth Circuit did find a cause of action for negligent design for damage to the chattel itself under the maritime tort law. As noted, the majority decision stated, "[T]here is a great deal of difference between proving that a product does not work and that it has been negligently designed or manufactured." *Jig III, supra*, 519 F.2d, at 175 n.5. The Court is not convinced that, even if a difference in proof is involved, plaintiff's position is such that he could not have and should not have protected himself through contract. The decision, being an interpretation of admiralty law, is not binding on this Court. In addition, the better reasoned dissent by Judge Gee appears to the Court to more accurately reflect the law of Georgia. Accordingly, Kaiser cannot assert a claim of negligent design against Ingersoll-Rand.

### 2. *Misfeasance/Nonfeasance*

Obviously, since Weatherly was not the designer of the compressor, no theory of negligent design can be asserted against it. Kaiser instead asserts that Weatherly negligently performed the contract, there relying on the misfeasance/nonfeasance distinction in Georgia law in order to avoid the general rule that damage to a purchased chattel itself alone does not give rise to an action for negligence.

The general rule is stated in *Maudlin v. Sheffer*, 113 Ga.App. 874, 150 S.E.2d 150 (1966):

> Generally, a mere breach of a valid contract amounting to no more than a failure to perform in accordance with its terms does not constitute a tort or authorize the aggrieved party to elect whether he will proceed ex contractu or ex delecti.

In addition, Ga.Code Ann. § 105–101 states that if a duty arises out of a contract, a plaintiff may not convert that action into one sounding in tort.

However, a reading of the Georgia cases attempting to state the misfeasance/nonfeasance distinction does not necessarily clarify that distinction. In *E & M Construction Company, Inc. v. Bob*, 115 Ga.App. 127, 153 S.E.2d 641 (1967) recovery in tort was permitted when a contractor removed the siding from a house and did not take measures to protect the thus exposed house. The interior of the house was damaged by water. The Court of Appeals remarked, "Independently of a duty under a contract, the law imposes upon a contractor the duty not to negligently and wrongfully injure and damage *the property of another*." *E & M Construction*, 115 Ga.App., at 128, 153 S.E.2d 641 (emphasis added). Several termite cases are difficult to reconcile. In *Orkin Exterminating Company, Inc. v. Stevens*, a negligence action was not permitted when infestation occurred in spite of treatments. The Court of Appeals remarked,

> "It is axiomatic that a single act or course of conduct may constitute not only a breach of contract but an independent tort as well, if in addition to violating a contract obligation it also violates a duty owed to plaintiff independent of contract

**3.** Kaiser's contract theories against Ingersoll-Rand including a third party beneficiary theory and an assignment of warranties' theory are discussed below.

to avoid harming him. [Citations omitted]. Such an independent harm may be found because of the relationship between the parties, or because of the defendant's calling or because of the nature of the harm."

*Orkin, supra,* 130 Ga.App. 363, at 365, 203 S.E.2d 587. However, in *Allred v. Dobbs,* 137 Ga.App. 227, 223 S.E.2d 265 (1976) a similar breach was found to constitute misfeasance.

■ In light of this less than clear state of authority, Judge Henderson, in his decision in *Synthetic Industries, Inc. v. Whitlock, Inc.,* 439 F.Supp. 1297 (N.D.Ga.1977) concluded that in the absence of a special relationship apart from the contract, the misfeasance/nonfeasance distinction was controlling in deciding whether plaintiff could assert a cause in negligence as well as in contract. He concluded that even though the language of the cases did not disclose a clear principle, looking to the nature of the harm suffered by the plaintiff would disclose such a principle. He concluded that in the absence of injury to life and limb or damage to other property, only a cause in contract was available.[4] Although this analysis is slightly unsatisfactory in relation to the termite cases, it appears to the Court to be a sensible analysis of the Georgia authority and one which follows the general rule set forth above at pp. 67–68.

Thus, Kaiser cannot assert an action in tort against Weatherly based on misfeasance in the performance of the contract.

### 3. *Professional Relationship*

■ One last theory in negligence asserted by Kaiser remains. That is the professional relationship exception. Under Georgia law, it is possible for a contractual relationship to give rise to a duty which exceeds the bounds of the contract itself. The doctrine was well explained in *Howard v. Central of Georgia Railway Company,* 9 Ga.App. 617, 71 S.E. 1017 (1911):

[I]f the result of a contract is to create a relationship between the parties, and there are certain duties which the law attaches to that relationship, the breach of one of these duties may give rise to an action in tort. For instance, a person makes a contract with a railroad company for transportation on one of its lines; the contract creates the relationship of carrier and passenger; the law attaches to that relationship certain duties, and a neglect of one of those duties gives rise to a cause of action ... But it is not to be contended that every contract creates such a relationship, or that the breach of every contract gives a cause of action in tort.

*Howard, supra,* 9 Ga.App., at 619, 71 S.E. 1017.

Thus, as reiterated in *Mauldin v. Sheffer,* 113 Ga.App. 874, 878, 150 S.E.2d 150 (1966), "In such a case the liability arises out of the breach of duty incident to and created by the contract, but is only dependent on the contract to the extent necessary to raise the duty." (citations omitted). Some of the relationships which may give rise to such a duty are principal and agent, bailor and bailee, attorney and client, physician and patient, carrier and passenger or shipper, master and servant, and engineer and client. See *Mauldin, supra.* Obviously, circumstances in which a professional violates his duty may give rise to an action in tort.

The existence of this cause of action being settled, it remains to determine whether such a claim can be asserted by Kaiser against Ingersoll-Rand or Weatherly. Considering the status of Ingersoll-Rand first, it is apparent that no professional relationship ever arose. The lawsuit concerns the breakdown of the air compressor evidently caused by the fracture of an inlet guide vane. Ingersoll-Rand was the manufacturer for the system. How the role of manufacturer of a product can solely through the failure of that product, become the role of a professional liable on a professional duty is not apparent to the Court. The district

---

4. In that case, however, poorly constructed silos caused damage to resin inside. Thus, a tort

action was available to recover some of the damages alleged.

court in *Synthetic Industries, supra,* decided in similar circumstances that such a relationship due to mere failure of a product was difficult to infer and that "... to do so in the absence of [proper] guidance would create an exception potentially as broad as the rule itself." *Synthetic Industries, supra,* 439 F.Supp. at 1300.

*Synthetic Industries* was based on interpretation of Georgia law. No party has cited a Georgia case squarely on point. Ingersoll-Rand has, however, cited two very persuasive cases. In *Bonebrake v. Cox,* 499 F.2d 951 (8th Cir. 1974) the court set forth the rule that when a contract appears to call for both goods and services, the court must decide which predominates. *Pittsburgh-Des Moines Steel v. Brookhaven Manor Water Co.,* 532 F.2d 572 (7th Cir. 1976) is cited for the proposition that the fact that goods are specially manufactured does not remove them from the category of goods. The conclusion accords with common sense: buying goods that required some expertise to design and manufacture does not mean that a professional relationship has been violated if the goods don't work.

■ That a party occupies a status that sometimes gives rise to professional duties, does not transform all contract disagreements into torts based on a professional relationship. See *Howard v. Central Railway Company,* 9 Ga.App. 617, 71 S.E. 1017 (1911).

■ An even larger difficulty is encountered by Kaiser in trying to assert breach of professional duty on the part of Ingersoll-Rand. That difficulty is that Ingersoll-Rand had no contractual relationship with Kaiser. There was no contract from which the professional duty could arise. See *Mauldin, supra.* If Ingersoll-Rand had a duty as a professional engineer, that duty was owed to Weatherly, its only client. It is settled in Georgia law that a third party not in privity cannot rely on a professional duty which might give rise to a negligence action had the injured party

been in privity. In *MacNerland v. Barnes,* 129 Ga.App. 367, 199 S.E.2d 564 (1973), plaintiff sued on the basis of an incorrect financial statement prepared by one defendant for another. Even though reliance by the plaintiff was known or foreseen, the court refused to recognize liability to a third party not in privity.[5] The court noted that in other professional relationship cases involving attorney/client relationship, actual participation in that relationship was a prerequisite to a negligence action. See *Smith v. International Lawyers,* 35 Ga.App. 158, 32 S.E. 245 (1926). The rule of *MacNerland* was expressly followed in *Howard v. Dun & Bradstreet, Inc.,* 136 Ga.App. 221, 220 S.E.2d 702 (1975). In conclusion because Kaiser had no relationship with Ingersoll-Rand from which a professional duty could arise, no negligence action for violation of professional duties will lie.

■ Weatherly's position in regard to Kaiser is somewhat different. Kaiser and Weatherly were in privity. Weatherly is alleged to have provided professional engineering services. One of Weatherly's arguments that a tort action based on an engineer/client relationship with Kaiser is not available is a factual one. Weatherly argues that Kaiser controlled the details of any "professional" work performed by Weatherly. Thus, it is argued, reliance on professional expertise did not arise. In addition, Weatherly argues, since the only failure was in regard to the inlet guide vane, a component of an air compressor made to Kaiser's specifications, the facts will not support an action based on violation of a professional duty. However, these arguments are based on inferences drawn from disputed facts and the Court reserves ruling on these issues.

Weatherly makes an additional argument that may dispose of the possibility of a tort action based on a professional relationship. This argument is based on the wording of the contract between Kaiser and Weatherly. That contract contains wording that defines "work" as including design, construction, workmanship, and testing. The

---

**5.** An exception was made for a possible action in fraud.

argument is that Weatherly's later contract with Kaiser mooted any claim in tort. The second agreement provided, subject to certain conditions which were fulfilled, that Kaiser would give Weatherly acceptance of "all work performed by Weatherly." The second agreement also states that as between Kaiser and Weatherly "each of them has fulfilled all their respective obligations to each other or to their respective agents, successors or assigns arising from or in any way related to [the Kaiser-Weatherly contract]." Thus, if all Weatherly's duties to Kaiser were encompassed by the definition of "work" in the original contract, Weatherly argues that the language of the settlement agreement precludes any suit in tort. Weatherly also argues that since any professional relationship must have arisen out of the contract, the settlement agreement necessarily disposes of any negligence claim.

 The Court disagrees. In the first instance, the definition of "work" does not necessarily include all that a client of a professional engineer might have a right to expect under the law. Simply because a professional relationship cannot arise except from contract does not mean that the limits of the duty so created are restricted by the terms of the contract. The scope of the duties arises by operation of law once the relationship is established. In *Mauldin,* a case concerning negligence of a professional engineer which obviously involved far stronger facts, the Georgia Court of Appeals allowed an action in tort on the basis of the defendant's failure "to exercise such reasonable degree of care, skill and ability as is ordinarily exercised under the same or similar conditions and under like circumstances by engineers generally in practicing their professions." *Mauldin, supra,* 113 Ga.App. at 881, 150 S.E.2d 150. No violation of the contract was alleged and no physical injury was involved.

 Nor is the Court of the opinion that the language of the settlement agreement prevents Kaiser from asserting a negligence claim against Weatherly. It is well-accepted that public policy favors the settle-

ment of disputes. *Sollek v. Laseter,* 126 Ga.App. 137, 190 S.E.2d 148 (1972). A settlement agreement is a contract which is governed by principles of local law applicable to contracts generally. *Florida Education Association, Inc. v. Atkinson,* 481 F.2d 662, 663 (5th Cir. 1973). Under Georgia law whether a contract is ambiguous is to be determined by the court. *Stone Mountain Scenic Railroad, Inc. v. Stone Mountain Memorial Association,* 230 Ga. 800, 199 S.E.2d 216 (1973). Where the contract language is definite and unambiguous, the Court will not resort to surrounding circumstance to interpret the agreement. *Opelika Mfg. Corp. v. City of Hawkinsville, Georgia,* 525 F.2d 941 (5th Cir. 1976); *Insurance Concepts, Inc. v. Western Life Insurance Company,* 639 F.2d 1108 (5th Cir. 1981).

 The Court finds that the contract language is not ambiguous. In order to contract out of liability for negligence, the contract must specifically disclaim liability for negligence. *Smith v. Seaboard Coast Line Railroad Company,* 639 F.2d 1235 (5th Cir. 1981). Here, the contract does not spell out any such disclaimer. The clear meaning of the settlement agreement is that Weatherly is free of its contractual obligations to Kaiser. However, the professional duty, although it arises only in the presence of a contractual relationship, is "a duty *apart from* any express contractual obligation." *Mauldin, supra,* 113 Ga. at 880, 150 S.E.2d 150 (emphasis added).

The cases cited by Weatherly for the proposition that a release of claims is to be interpreted as a release of all claims are not persuasive to the Court. The following language from *Glover v. Southern Bell Telephone & Telegraph Company,* 229 Ga. 874, 195 S.E.2d 11 (1972) is quoted to support the proposition that the Kaiser-Weatherly settlement agreement bars all claims including any negligence claim arising from the existence of a professional relationship: "Where a release is general, i. e., one that releases the alleged tortfeasor from all claims arising out of an occurrence, in the absence of fraud such release will bar any cause of action by the person executing such release.

*Gregory v. Schurstein*, 212 Ga. 497 [93 S.E.2d 680]." Yet, *Glover* and the other cases cited include fact situations in which the original occurrence was a tort. In those situations, it is far more likely that the parties intended to release tort liability. It is still necessary that there be a meeting of the minds as to the subject matter. *Mason Gin & Fertilizer Co., Inc. v. Piedmont Acid Delinting, Inc.*, 126 Ga.App. 298, 190 S.E.2d 604. The language employed in the Weatherly-Kaiser settlement agreement, while sufficient to extinguish all contract claims by Kaiser against Weatherly, did not absolve Weatherly of any possible tort liability arising from its professional relationship with Kaiser.

### B. *The Contractual Claims*

■ Plainly, in the face of the settlement agreement, Kaiser cannot assert a claim against Weatherly based on contract. Kaiser has made contractual claims against Ingersoll-Rand as well. Since Kaiser and Ingersoll-Rand were never in privity, Kaiser depends on two theories to hold Ingersoll-Rand liable for contractual claims. The first is that Kaiser has the right to enforce the terms of the Weatherly–Ingersoll-Rand contract as a third party beneficiary. The second is that the settlement agreement between Kaiser and Weatherly contains an assignment by Weatherly to Kaiser of all vendor and supplier warranties still in effect at the time of the agreement.[6]

Georgia case law has not been enthusiastic in extending the right to sue in contract to parties who are not in privity with the defendant. *See, generally, Ellis v. Rich's Inc.*, 233 Ga. 573, 212 S.E.2d 373 (1975); *Ponce de Leon Condominiums v. DiGirolama*, 238 Ga. 188, 232 S.E.2d 62 (1977). This rule requiring privity has been approved by some scholars. Professors White and Summers have stated,

"In any event, we agree with the majority position that generally non-privity plaintiffs may not recover for economic loss ... Moreover, here more than in personal injury and property damage cases, it is appropriate to recognize the traditional rights of parties to make their own contract ... In short, we believe that a buyer should pick his seller with care and recover any economic loss from that seller and not from parties remote to the transactions."

White and Summers, *Handbook on the Uniform Commercial Code* (1972).

It is with this general rationale in mind that the theories advanced by Kaiser are examined.

### 1. *Third Party Beneficiary*

■ The law of Georgia has not been anxious to find that parties not in privity can sue under the aegis of the third party beneficiary doctrine. Under Georgia law, a plaintiff must be an intended rather an incidental beneficiary and it must clearly appear from the contract itself that both contracting parties intended to benefit the third party. *See, generally, Seaboard Construction Co. v. Continental Mortgage Investors*, 298 F.Supp. 579 (S.D.Ga.1969); *Continental Casualty v. Continental Rent-a-Car of Georgia*, 349 F.Supp. 666 (N.D.Ga. 1972), *aff'd* 468 F.2d 950 (5th Cir. 1972); *Miree v. United States*, 242 Ga. 126, 249 S.E.2d 573 (1978), *applied*, 588 F.2d 453 (5th Cir. 1979); *Backus v. Chilivis*, 236 Ga. 500, 502, 224 S.E.2d 370 (1976). As pointed out by Ingersoll-Rand, both Ingersoll-Rand and Weatherly were perfectly capable of declaring when any contractual provision was intended to inure to the benefit of a third party.

■ As is clear from the decision in *McWhirter Material Handling Co. v. Georgia Paper Stock Co.*, 118 Ga.App. 582, 164 S.E.2d 852 (1968), the fact that a third party is mentioned in the contract does not necessarily indicate that a third party beneficiary situation is created. In that case, the third party was clearly envisioned as having a role in the waste disposal scheme yet was not a contractual beneficiary.

---

**6.** The terms of the contract between Ingersoll-Rand and Weatherly are disputed. However, unless one of the theories advanced is valid to hold Ingersoll-Rand responsible to Kaiser, the terms of the Weatherly–Ingersoll-Rand contract are of no importance.

Kaiser argues that without an intent to benefit Kaiser, the contract between Ingersoll-Rand and Weatherly would never have been entered into. Although not specifically couched in terms of third party beneficiary law, the Court is of the opinion that the Georgia Supreme Court in *Ponce de Leon Condominiums v. DiGirolama*, 238 Ga. 188, 232 S.E.2d 62 (1977) is pertinent here. In that case, a developer tried to sue the engineer who had designed the plan for surface water flow for his project. A neighboring land owner had successfully sued the developer for damage caused by surface water runoff in excess of what would have occurred naturally. The Georgia court refused to allow the developer to recover against the engineer because the developer's architect rather than the developer himself had hired the engineer. That the architect would be acting for the ultimate benefit of his client should have been obvious. In the case at bar, Kaiser is no more than a known remote buyer. The Court does not hesitate to conclude that Kaiser cannot maintain a contractual action against Ingersoll-Rand based on a third party beneficiary theory.

### 2. *Assignment*

The settlement agreement between Kaiser and Weatherly clearly purports to assign Weatherly's supplier and vendor warranties to Kaiser. Kaiser argues that such an assignment is expressly permitted by Georgia Code Annotated § 109A–2–210(2):

Unless otherwise agreed, all rights of either the seller or buyer can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on him by his contract, or impair materially his chance of obtaining return performance. A right to damages to breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation can be assigned despite agreement otherwise.

However, it has long been the law in Georgia that a warranty may not be assigned. "In a sale of personal property, the warranty is *not negotiable or assignable* and does not run with the article sold." *Smith v. Williams*, 117 Ga. 782, 45 S.E. 394 (1903). This language was reaffirmed in 1974 after Georgia's adoption of the Uniform Commercial Code. *Stewart v. Gainesville Glass Co.*, 131 Ga.App. 747, 206 S.E.2d 857 (1974) aff'd, 233 Ga. 578, 212 S.E.2d 377 (1975). In *Stewart*, the purchaser of a house sued the manufacturer of insulating glass. The glass was defective in that moisture and dust collected between the sheets of glass obscuring the view. The defect was in direct violation of an express ten-year warranty which was given by the manufacturer to the first buyer. No injury to other property or to a person was involved.

The Georgia Court of Appeals in *Stewart* clearly upheld the privity requirement in a warranty action, whether the warranty was express or implied. The court stated,

No principle is in sight which would . . . invest the new party with any right whatever as against the manufacturers or first vendors. Further, in a sale of personal property the warranty is not negotiable or assignable, and does not run with the article sold . . . Here we deal with an *express* warranty, rather than an implied warranty, and it would appear that the privity requirement applies with even more force.

*Stewart, supra,* 131 Ga.App. at 752, 206 S.E.2d 857.

This is the precise reasoning approved by Professors White and Summers: "If a remote seller wishes to sell at a lower price and disclaim his liability for economic loss to subpurchasers, why should we deny him that right?" White and Summers, *Handbook of the Law Under the Uniform Commercial Code* (1972) § 11–7, at 334.

Kaiser argues that the weight of Georgia authority cited has no application because the warranties involved in those cases were not expressly assigned as they were in the Kaiser-Weatherly settlement agreement. However, in light of the clear language of the Georgia cases forbidding the assignment of warranties, such an assignment is

futile. The courts of Georgia have apparently decided that any assignment of warranties materially changes the risks and burdens of the original seller under the terms of § 109A–2–210(2).[7]

It is axiomatic that Weatherly could not assign to Kaiser what it did not have. Weatherly did not have, under Georgia law, a transferable warranty. While Weatherly could have assigned a chose in action based on its *own* right to enforce warranties against Ingersoll-Rand, which would be necessarily limited to its $200,000 contractual exposure, the plain language of the agreement does not support such an interpretation. Kaiser does not seek to enforce Weatherly's rights; it seeks to apply any warranties in recovering *its own*, not Weatherly's damages. No warranty action is available to Kaiser as assignee.

### C. *The Fraud Claims*

The Court reserves ruling on the fraud claims until the end of trial.

### IV. *Conclusion*

In summary, judgment may be entered for Weatherly and Ingersoll-Rand on all claims based on contract. Judgment may be entered for Ingersoll-Rand on all claims based on negligence. Kaiser may assert no negligence theory against Weatherly with the exception of a claim based on violation of a professional duty. No claims in fraud are disposed of by this Order.

---

7. Kaiser argues that the duty to supply a defect-free machine was identical whether Kaiser or Weatherly had the right to enforce the warranties. However, since the original contract would always remain the same in any assignment situation, according to Kaiser's logic, the burden on the promisor would never change. The statute would then be superfluous.